### LORBER et al. v. VISTA IRR. DIST.
### No. 9873.

Circuit Court of Appeals, Ninth Circuit.
April 16, 1942.

W. Coburn Cook, of Turlock, Cal., for appellants.

A. M. Thompson, of San Diego, Cal., for appellee.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

In March, 1938, Appellee Vista Irrigation District (hereinafter referred to as the District), an irrigation district organized under the provisions of the California Irrigation District Act, approved March 31, 1897, and acts amendatory thereof, Cal.Stats. 1897, p. 254, as amended, Deering's General Laws, Act 3854, filed a petition for composition of debts under the provisions of Chapter IX of the Bankruptcy Act of 1898 as amended, 11 U.S.C.A. §§ 401–404. After a hearing of the petition, the District Court entered its interlocutory decree confirming the plan of composition proposed by the District. Certain bondholders of the District appeal.

The District, comprising 18,309.48 acres of land in San Diego County, California, was organized in 1923 and January 1, 1925, it issued its 6% semi-annual interest paying coupon bonds in the amount of $1,700,-000 due serially from 1946 to 1965. All due interest on the bonds was paid to January 1, 1933, but trouble had already been sighted for in 1932 a Bondholders Protective Committee was organized, and persons owning 93% of the outstanding bond issue signed an agreement to effect a reduction in interest payable from 1933 to 1937. The agreement provided for the payment of $10 on the January and July 1933 and the January 1934 coupons, $15 on the July 1934 and January 1935 coupons, $20 on the July 1935 and January 1936 coupons; and $25 on the July 1936 and January 1937 coupons, in each case instead of the $30 provided by those coupons. The July 1937 coupon of $30 was to be paid in full. The total reduction in interest payable from 1933 to 1937 was thus agreed to be reduced from $300 to $180 per bond. The bondholders received tokens in exchange for the ten interest coupons.

After the enactment of Section 36 of the Emergency Farm Mortgage Act, 43 U.S.C.A. § 403, an application was made on October 18, 1933, by the District to the Reconstruction Finance Corporation (commonly referred to as R.F.C.) for funds with which to reduce and refinance the bonded debt of the District. On June 29, 1934, to this end R.F.C. adopted a resolution providing for the furnishing of not over $937,500 subject to certain specified terms and conditions, one of which was set forth as follows: "All or any part of the Old Securities acquired or held by or on behalf of this Corporation through any disbursement of or from the loan authorized hereunder as well as all rights in or to such Old Securities, may be kept alive for a greater or lesser time and for any purpose the Division Chief and Counsel may deem necessary, but this Corporation may at any time require the Borrower to issue its new 4% bonds and exchange the same for the Old Securities held by or on behalf of this Corporation. Until such Old

Securities have been exchanged for New Bonds, all such securities as well as all rights in or to the same shall continue to be and constitute obligations of the Borrower for the full amount thereof and nothing in this resolution shall be deemed to limit the right of this Corporation to enforce or cause to be enforced full payment of principal and interest of such Old Securities as and when the Division Chief and Counsel shall deem it advisable to do so * * *."

Thereafter the District by resolution accepted and approved the "terms, conditions, covenants and promises set forth in said resolution of Reconstruction Finance Corporation".

The money from R.F.C. was calculated to "provide payments for each dollar of the principal amount of Old Securities so deposited upon a graduated scale, depending on the percentage or percentages of all Old Securities so deposited * * *". The highest price to be paid was to be 55 cents.

Slightly over 96% of the outstanding bonds of the District were deposited in accordance with the arrangement between the District and R.F.C. The deposit was accomplished by the bondholders signing an escrow agreement with a named depository, providing in part as follows:

"I hand you herewith the following bonds of the Vista Irrigation District * * * which you are authorized to deliver to the Treasurer of said District upon receipt for my account of a sum of money equal to that portion of the principal sum of said bonds as determined by the following schedule. * * *

"It is further understood and agreed that title to the deposited bonds, coupons and/or tokens shall pass from me to Vista Irrigation District, or its order, upon receipt by you for my account of the first payment contemplated under the above schedule * * *."

The bondholders received receipts for their deposits, reading, in part: "Vista Irrigation District by its agent and depositary * * * acknowledges receipt of the foregoing tokens issued under Bondholders' Protective Agreement dated October 1, 1932, and bonds and coupons of Vista Irrigation 'District, being * * * face amount of bonds with the described accompanying coupons to be held subject to the foregoing instructions and upon the conditions therein specified * * *."

In December, 1936, certain bondholders, including appellants herein Roy R. Dempster, J. R. Mason, H. M. Lorber and Frances V. Wheeler, filed in the Superior Court of the State of California their Petition for Writ of Mandate against the District, alleging, among other things: That there were certain unpaid coupons on the bonds belonging to the petitioners; that the District had on hand sufficient funds with which to pay the same, but that the District refused to apply said funds to the payment thereof; "that the only outstanding bondholders of said irrigation district are bondholders holding $68,000 of bonds and the Reconstruction Finance Corporation of the United States, who holds all of the other bonds of said district as collateral security for a loan made to said district * * *". A writ of mandamus was sought directed to the District, commanding it to pay the petitioners' interest coupons accrued to date in full with interest thereon at 7% from the respective dates of presentation for payment.

The District did not make an appearance in the proceeding, and after hearing the State Court on January 15, 1937, gave judgment directing the District to pay said coupons in full with interest as prayed. In the judgment of the Court it is recited, "That the outstanding bondholders of the respondent irrigation district are bondholders holding not to exceed $68,000 of bonds of said district, including those of petitioners, and also the Reconstruction Finance Corporation of the United States, who holds all of the other bonds of said district as collateral security for a loan to said district * * *".

Thereafter, on November 9, 1937, the same bondholders filed a second petition for writ of mandate in the State Court, reciting the rendition of the January 15, 1937, judgment; alleging that the treasurer of the District had failed and refused to pay subsequently matured coupons on their bonds when presented, and that the District had failed to levy the proper amount necessary to provide for payment of interest maturing on the bonds; and praying that a writ of mandamus issue directing the payment of the interest due on the bond coupons and that the District be directed to levy a sufficient assessment to provide for maturing interest.

On November 13, 1937, another bondholder, Arthur Lorber, also one of the appellants herein, filed in the same State Court

a petition and complaint in intervention, in which he adopted all the allegations of the last mentioned petition for writ of mandate and requested the same relief as to bond coupons owned by him as was prayed in the other petition.

Again the District defaulted, and after hearing, the State Court on November 29, 1937, rendered judgment in the action filed November 9, 1937, directing the payment of the petitioning bondholders' matured interest coupons, and further directing the Board of Directors of the District to levy an assessment sufficient in amount to pay the interest accruing upon the bonds of the petitioners, and to "continue to make such levies from year to year until the obligation of said bonds have been fully paid and discharged".

The judgment recited, among other things, "That there is no other outstanding indebtedness of said respondent district which has matured except only interest due upon bonds of said district amounting to not to exceed $33,000.00, being interest at 6% per annum which became payable January 1, 1937 and July 1, 1937, * * *".

The judgment also provided "that the court retain jurisdiction of this cause for the purpose of requiring the respondents or their successors in office to levy and collect the assessments herein provided and to pay the same to the petitioners or their assigns."

On January 20, 1938, a similar judgment was entered by the Court with reference to the petition of Arthur Lorber filed November 13, 1937.

The judgments referred to are all final judgments in the California courts.

There also appears in the record an Alternative Writ of Mandate dated March 9, 1938 in an action filed in the State Court by J. B. Bloom, another of the appellants herein, in which the District is commanded to pay to the petitioner the amount due on coupons on his bonds, or show cause on a specified date why it has not done so. According to a statement made in the trial court by counsel for the appellant bondholders, an answer was filed by the District to the petition filed by J. B. Bloom in which it was prayed that the alternative writ of mandate be discharged. A motion for change of venue was also made by the District, but no further proceedings were taken by mutual agreement because of the filing in the interim of the instant petition for composition of the District's debts.

It thus appears that all of the appellants herein, with the exception of the appellants Gilbert Moody and Stanley W. Landis, are holders of judgments or an order of one sort or another against the District, rendered by the California State Court. It is urged by the appellants that these judgments and this order are res judicata of the issues involved in the instant proceeding.

The appellants' points upon this appeal are specified in their opening brief as follows:

"First Proposition: The plan of composition has not the consent required by Chapter IX of the Bankruptcy Act, Title to the block of bonds claimed by the R. F.C. passed from the original bondholders to the District which had no authority under the California law to sell or transfer them to the R.F.C. Assuming a transfer, however, the R.F.C. held them at most as collateral security for the loan it consummated."

"Second Proposition: The Court erred in classifying the R.F.C. and the appellants as creditors of the same class. The R.F.C. is not affected by the plan of composition."

"Third Proposition: The offer of the plan and the acceptance are not in good faith." Under this "Third Proposition" a "Subproposition" is stated to be the Court erred in refusing to accept into evidence Petitioner's Exhibit G."

"Fourth Proposition: The District is not insolvent nor unable to pay its debts as they mature."

"Fifth Proposition: The plan of composition is unfair, unjust and inequitable and discriminates against the appellants."

"Sixth Proposition: The Trial Court did not have jurisdiction to enter the decree because the Superior Court of the State of California had and still retains jurisdiction of the officials of the District and of the annual levying and collection of assessments, and the decree interferes with the governmental and political powers of the District and of the Superior Court of the State of California and the sovereign powers of the State of California, and therefore is unconstitutional and void. That the right of appellants to have assessments levied for the full amount of their claims is res judicata."

Since the appellants in the first portion of their "Sixth Proposition" question the jurisdiction of the District Court to enter-

tain the proceedings in the first instance, we shall treat of that question first.

### Jurisdiction of the District Court

The point here is that since the State Court in its judgment of November 29, 1937, directed the District to continue to make annual levies from year to year sufficient in amount to pay the interest accruing upon the petitioning bondholders' bond coupons, and since the Court specifically retained jurisdiction of the cause for the purpose of requiring the District to levy and collect such assessments, the District Court had no jurisdiction to "interfere".

It is also stated in the appellants' argument under this point that they have final judgments to the effect that it is the duty of the district and its officers to levy assessments annually and to pay the appellant's bond coupons in full, and then the question is asked "How can the Federal Court now intervene and order the district absolved and discharged from that judgment?"

In other words, the appellants would seem to argue that once a creditor has a judgment of a state court requiring certain payments to be made by a debtor, that debtor may never obtain the relief of a Bankruptcy Court in scaling down his indebtedness. The statement of the proposition proves its own lack of merit. The whole purpose of Congress in enacting the debt composition legislation would be nullified and rendered ineffectual if actions such as those brought by the dissenting creditors could forestall bankruptcy proceedings. We hold that the District Court had jurisdiction to entertain the petition for debt composition.

### Is R.F.C. a Creditor Affected by the Plan?

This question is paramount in appellants' First and Second "Propositions". In the "First Proposition" the argument runs somewhat as follows:

That under the Bankruptcy Act, 11 U.S. C.A. § 403, it was requisite that the petition herein be consented to by creditors of the petitioner owning not less than 51% of the securities affected by the plan (excluding, however, any such securities owned, held or controlled by the petitioner); that under the negotiations between R.F.C. and the District and the former bondholders, the District became the owner of the deposited bonds; that under California law the District had no authority to sell or transfer

these bonds to R.F.C.; that therefore the consent of R.F.C. may not be considered in determining whether or not the requisite number of creditors have consented to the plan of composition.

Under this "First Proposition" it is argued in the alternative that assuming the District did in some manner transfer the bonds to R.F.C., that agency held them merely as collateral security for the loan to the District; and that holding the bonds in this status did not entitle R.F.C. to be counted as a consenting creditor. The judgments and orders of the State Court outlined in our statement of the facts of the case before us are pleaded as res judicata of the fact that the R.F.C. held the bonds as collateral security only.

The argument of the "Second Proposition" relative to R.F.C. is that since R.F.C. held the bonds as collateral security only, R.F.C. is not affected by the plan of composition, and that hence the appellant bondholders' bonds are in a different class from those held by R.F.C. Res judicata is relied upon by appellants for their first premise in this "Second Proposition" as well as for their position in their "First Proposition".

Before proceeding to a discussion of the question of res judicata, however, it should be noted that in West Coast Life Insurance Company et al. v. Merced Irrigation District, 9 Cir., 114 F.2d 654, where the proceedings for readjustment of the debts of the Merced Irrigation District through moneys acquired from R.F.C. were almost identical with those in the instant case, this Court held that R.F.C. was a creditor affected by the plan. In defining the nature of the transaction between the Merced District and R.F.C. we said, at page 667 of 114 F.2d:

"It seems clear to us that R.F.C. agreed to furnish money to the District to refinance its entire bonded debt at $515.01 for each $1000 bond. The arrangement was subject to the condition that all old securities should be purchased and held by R.F.C. until R.F.C. was satisfied that refinancing was complete. During this time, the old securities were to be kept alive and outstanding. When the refinancing was complete, then and then only was R.F.C. under the duty of buying and accepting refunding bonds, and surrendering the old securities for cancellation.

" * * * It cannot be questioned that under the express terms of the Act, R.F.C. as holder of the old securities, is a 'credi-

634

tor affected by the plan' to the full face amount of those old securities. Appellants' entire argument is based upon the erroneous assumption that the old securities are no longer outstanding, or that they belong to the District and are pledged as collateral for the 'loan' from R.F.C. to the District."

It is true that in the instant case there is an element that we did not have in the Merced case, supra, and that is that the consenting bondholders here signed escrow instructions which we have quoted above, in which it is recited that title to the deposited bonds should pass to the District or its order upon receipt by the consenting bondholders of the amounts to be advanced by R.F.C.

■ But we have no hesitancy in holding that this additional element does not change the theory of our holding in the Merced case. As we said in that case, "It will not do to merely examine the foundation and framework of the structure as separate and detached parts of the whole". The entire transaction must be considered together, and when it is viewed from the perspective there is no difference in the transaction between R.F.C. and the District in the instant case and the transaction with which we were concerned in the Merced case. It is clear that even though the consenting bondholders' escrow instructions stated that title to the bonds should pass to the District "or its order", the District itself did not, and it was not contemplated that it should, take title. Instead the bonds went to R.F.C. under the express agreement of the parties that they should remain outstanding obligations of the District for the full face amount thereof until the refinancing was completed.

In the Merced case we also had for consideration the question of whether or not the bonds held by R.F.C. were in a different class from those held by the objecting bondholders, and we there held that the bonds were all of the same class.

Unless there is something in the appellants' plea of res judicata to compel a different conclusion, then, the Merced case is direct authority against the appellants' "First Proposition" and "Second Proposition".

Res Judicata

■ At the outset it should be noted that the appellants take the view that the judg-ments of the State Court are res judicata as to "matters which were adjudged in those cases or which could have been adjudged".[1]

■ In Nevada-California Electric Securities Co. v. Imperial Irrigation District, 85 F.2d 886, 898, this Court had occasion to consider the elements of the plea of res judicata, and we there pointed out that the doctrine of res judicata has a double aspect. A former judgment operates as a bar against a second action upon the same cause, but in a later action upon a different claim or cause of action it operates as an estoppel or conclusive adjudication only as to such issues in the second action as were actually litigated and determined in the first action.

What, then, was actually litigated and determined in the State Court actions upon which the appellants rely in their plea of res judicata?

The judgment of January 15, 1937, is the strongest one to support the appellants' claim, and we therefore confine our discussion to that judgment. If we hold against the plea of res judicata as to this judgment, our holding will necessarily carry with it the plea as the remaining judgments pleaded by the appellants.

As we stated above, this judgment was rendered by the Superior Court of Stanislaus County, California, upon the petition of certain bondholders, including some of the appellants herein, for a writ of mandamus to require the District to pay the petitioners' accrued interest coupons in full with interest thereon at 7% from the respective dates of presentation for payment.

The allegations of the petition concerning the ability of the District to make the payment were that the District had on hand sufficient funds with which to pay the same, and "that the only outstanding bondholders of said irrigation district are bondholders holding $68,000 of bonds and the Reconstruction Finance Corporation of the United States, who holds all of the other bonds of said district as collateral security for a loan made to said district, and that all amounts due said Reconstruction Finance Corporation on account of said loan have been paid and no further payments of principal or interest will become due to the said Reconstruction Finance Corporation until January 1, 1937 * * *". The judgment

---

[1] R. F. C. was not a party to the California Court proceedings nor is it a party to these proceedings, hence no question of res judicata against it can arise herein.

given by the Court contains a finding that all of the allegations of the petition were true and "that the outstanding bondholders of the respondent irrigation district are bondholders holding not to exceed $68,-000 of bonds of said district, including those of petitioners, and also the Reconstruction Finance Corporation of the United States, who holds all of the other bonds of said district as collateral security for a loan to said district, and that all amounts due the Reconstruction Finance Corporation prior to January 1, 1937, have been paid".

With the language of the State Court's judgment in mind, let us again refer to the appellants' claim under their "First Proposition". The argument first runs that the District became the owner of the deposited bonds and that under the California law the District had no authority to sell or transfer the bonds to R.F.C. Yet the very judgments upon which they rely in their plea of res judicata decree that the bonds are "outstanding bonds" and are "held by" R.F.C.

It at once becomes apparent that if the appellants are to succeed at all upon this "First Proposition" it must be upon some theory that the finding of the State Court to the effect that R.F.C. held the deposited bonds "as collateral security for a loan to said district" militates against R.F.C. being a "creditor affected by the plan".

As we pointed out in the Merced case, supra, the Bankruptcy Act under which these proceedings were brought (11 U.S.C.A. § 402), defines the term "creditor" as "the holder of a security or securities", and further provides that "Any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of full face value thereof". The term "security affected by the plan" is defined in the same section as "a security as to which the rights of its holder are proposed to be adjusted or modified materially by the consummation of a composition agreement".

The State Court judgments are entirely consistent with a view that the bonds are held by R.F.C. "pursuant to a contract with" the District. In our view the fact that they may or may not have been held as collateral security only is immaterial.

An additional question arises, however, by reason of the fact that the Act contains a further provision that in counting the consenting creditors there shall be excluded "any such securities owned, held, or controlled by the petitioner".

█ But title to the deposited bonds was not litigated, and naturally could not have been litigated in the State Court actions. The only thing in issue was the question of the District's indebtedness to the petitioners on their bond coupons, and the ability of the District to make the payment of those coupons. The Court found that all of the bonds of the District were outstanding, which in itself negatives any idea that the District was the owner thereof. In our view there is nothing at all inconsistent with a holding that the deposited bonds were held by R.F.C. as collateral security for a loan to the District and our view that R.F.C. may be considered as a consenting creditor, the deposited bonds which it "holds" not being owned, controlled or held by the District.

Appellants' First and Second "Propositions" therefore fail.

### Good Faith of the District

In their claim that the offer of the plan and its acceptance by the consenting bondholders were not in good faith, the appellants first urge their "Sub-proposition" that there was error in the Court refusing to accept into evidence their proposed Exhibit G. It appears that this exhibit was attempted to be introduced by the appellant bondholders as pertaining to the question of the good faith of the District.

The exhibit consisted of a letter to the Board of Directors of the District from Mr. Mull, the Secretary-Manager of the District, and was to the effect that there would be a saving of $5,415 if the District would deliver the new bonds to R.F.C. at that time and not go through bankruptcy but instead recognize the bonds of the appellants as outstanding obligations and not subject them to the composition plan.

█ In the first place, it is difficult to see just what bearing such a statement would have upon the question of the good faith of the District. As we view it, the fact that the Secretary-Manager of the District proposed to the Directors that they not go through bankruptcy would not be any proof at all that the Directors in disregarding the suggestion did so in bad faith. Indeed, good faith to everybody would move the Directors to do everything possible toward treating *all* bondholders alike,

and a too great readiness to pay some a larger amount might more properly be argued to indicate unfairness.

But aside from that, the following excerpts from the record illustrate that there was no error in the Court's ruling:

"Mr. Thompson [Attorney for the District]: [after being asked for a stipulation that the letter offered in evidence was received and considered by the Directors of the District] I have no recollection at all of that letter being presented to the board. It may have been at a meeting at which I was not present. It is the first time I have ever had any knowledge of seeing that letter. I don't wish to take up time arguing this question.

"The Court: Do you recall, Mr. Mull [the witness being examined and the writer of the letter], attending any meeting of the board of directors of the Vista Irrigation District where this communication, dated January 17, 1938, was read and discussed?

"A. Your Honor, these reports that I made to the board are usually written up and delivered to them by mail, and they are taken up for consideration at some future time, and I do not recall the details or circumstances concerning this particular communication.

"The Court: Unless the foundation can be laid that this communication was ever read at a board meeting, I would be inclined to sustain the objection."

So far as appears by the record before us, no further attempt was made by counsel for the appellants to connect the letter with any official action on the part of the District.

As stated by the trial judge at the time the letter was first presented for introduction in evidence: "You can't say that it is an admission by the district, because it is nothing more than a communication from the manager of the district to the board of the district. In other words, if the district is represented by its board, then it isn't the board that makes this statement, but one of the officers who is communicating to the board his views. It is nothing more than his opinion, and I don't see that it constitutes an admission by the district."

■ We find no error here.

■ We have examined the evidence which the appellant bondholders claim discloses bad faith on the part of the District, but we do not agree with the appellants' conclusion that it does disclose bad faith.

Typical of the evidence upon which the appellants rely in their claim of bad faith on the part of the District is a letter from the District's attorney to R.F.C., dated June 18, 1936, pointing out that refunding of R.F.C.'s bonds and honoring the 68 bonds that were then outstanding would not cost the district a great amount of money. We have already answered this claim of bad faith. Furthermore, when it is kept in mind the date when this letter was written, which was shortly after the decision of the United States Supreme Court in Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309, declaring the then existing Municipal Bankruptcy Act, 11 U.S.C.A. §§ 301–303, unconstitutional, and before the amendment to the Act which was later held constitutional in United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137, it seems clear that the letter is no evidence of bad faith. At that time the District apparently had no remedy other than to adjust the matter with R.F.C. All that the letter shows is an effort on the part of the District to settle with R.F.C. at that time on the most favorable terms possible.

### Insolvency of the District

Appellants' next argument relates to the finances of the District. Several points are raised under this heading, the first of which may best be understood through a quotation from appellants' opening brief: "The Court, while purportedly finding that the district is insolvent as a basis for the adoption of the plan of composition does not find what the assets are and their relation to liabilities, * *. Unless the Court specifically finds what the assets are it is clearly in no position to judge or determine whether the district is insolvent or the plan of composition is fair". Citing Consolidated Rock Products Co. et al. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

In this connection, the findings of the District Court on the question of the insolvency of the District are as follows:

"* * * During the past nine years tax delinquencies in said District have been heavy. The average delinquency from 1932 to 1937 has been 29.8%. Owners of 3789 acres within said District have failed to pay their taxes for more than three years next preceding the commencement of

these proceedings. Tax deeds have been taken on 2586 acres, thereby materially increasing the tax load on the remaining land of the District.

\* \* \*

"The petitioner is insolvent and unable to pay its debts in full, and ever since approximately July 1, 1930, has been unable to meet its debts as they mature. \* \* \*

"The indebtedness of petitioner consists of outstanding·bonds in the total amount of $1,700,000.00 issued by it under date of January 1, 1925 · \* \* \*. That the accrued unpaid interest for the years 1933 to 1938 inclusive amounts to $375,143.44.

"The life of the pipe lines comprising the irrigation system owned by said District ranges from 10 to 20 years. Said pipe lines were installed in the year 1926, and are in need of repair and replacement as to a considerable portion thereof, so that the water users may be properly served.

"The cash moneys available to said District are insufficient to meet all of its obligations, particularly to pay current expenses for carrying on its functions, for keeping its pipe lines and irrigation system in serviceable condition, in addition to paying interest and other obligations arising out of its bonded indebtedness, and said District is not able to realize out of tax certificates, real estate, accounts receivable and other assets, sufficient moneys to meet its obligations as they mature, or to provide a sinking fund necessary to retire its outstanding bonded indebtedness. \* \* \*

"All of the allegations and averments set forth in the petition for confirmation and of the plan of composition filed herein are true and have been established by a preponderance of the evidence, and petitioner is entitled to have the relief prayed for."

One of the allegations of the petition, which the trial court found to be true, is: "That on account of the adverse agricultural conditions and general depression which prevailed during the greater part of the past seven years, the market value of farm products produced within Petitioner was generally less than the cost of production; that farming operations therein have been unprofitable; and the installments of taxes and tax obligations levied upon the real property within Petitioner and falling due in such period were greater than the ability of the lands to produce, or the owners to pay. That by reason of the inability of Petitioner to collect sufficient taxes to meet its obligations, it is unable to meet its debts as they have matured or will mature, making it imperative that it effect a composition and readjustment of its debts pursuant to the above mentioned Act."

It .seems to be the appellants' point that in addition to the above findings, a further finding should have been made as to the assets of the District and their relation to its liabilities, before the conclusion could properly have been drawn to the effect that the District is unable to meet its debts as they mature.

■ We do not agree. The situation here is similar to the one we had under consideration in the case of Newhouse v. Corcoran Irrigation District, 114 F.2d 690, wherein we said: "Throughout appellants' briefs the principle of ordinary or private bankruptcy that the assets of the bankrupt, including his property, must be effectively applied to the debts, is sought to be applied to the situation before us. The bankruptcy of a public entity, however, is very different from that of a private person or concern. The operative assets of an irrigation district and the value of the land of the District, of course, have their evidentiary value as to the amount of money the District can reasonably raise to meet its indebtedness. These elements of value are too affected by the incumbrances upon the land \* \* \*. But such assets and such property within the District cannot be disposed of as in the ordinary bankruptcy proceeding for the benefit of the debtor."

■ It is our opinion and we hold that the findings of the trial court to the effect that the tax delinquency in the District had been high for several years past; that the cost of operations exceeded the income from the properties within the District; that the taxes during the past years were greater than the ability of the land to produce or the owners to pay; and that interest to the extent of $375,143.44 had accrued from 1933 to 1938, are sufficient to support the conclusion as to the insolvency of the District. This, of course, is on the assumption that the findings quoted are supported by the evidence.

The appellants, however, raise as their next objection the claim that the findings are not so supported. The finding that the unpaid interest from 1933 to 1938 amounted to $375,143.44 is attacked. Attention is called to the agreement signed in 1932 by holders of 93% of the District's outstanding bonds at the time the Bondholders Pro-

tective Committee was organized, which, as we recited above, provided for a reduction in interest payable from 1933 to 1937 from $300 to $180, or $120 per bond. There were 1700 bonds issued by the District. Figuring $120 per bond for the entire 1700 bond issue would be a reduction of $204,000. Since the agreement was signed by holders of only 93% of the bonds, the appellants take 93% of this $204,000 and arrive at the figure of $189,720 as the total reduction in interest by the agreement referred to. They urge that this $189,720 should be deducted from the $375,143.44 which the Court found to be delinquent interest, leaving $185,423.44 as the amount of the delinquency. The cash on hand in the District's treasury was shown to be $229,830.46, and from this it is urged that the District was not unable to meet its debts, particularly in view of the fact that no payment is due on the principal of any bond until 1946.

There are several answers to the appellants' argument, the first of which is found in our decision in Moody v. James Irrigation District, 114 F.2d 685, 689, wherein we said: "It must be remembered that this is not a proceeding in liquidation and the principles to be applied must differ somewhat from such a proceeding. In liquidation it is perfectly evident that the creditors would get almost nothing. To afford the plan of payment proposed the District must be in a position to proceed as a going District and for this reason its cash on hand cannot be too greatly depleted."

We have already referred to the finding of the trial court, which is supported by the evidence, to the effect that portions of the pipe lines comprising the irrigation system owned by the District are in need of repair and replacement. According to the testimony of the District's experts, not less than $20,000 per year should be spent for rehabilitation, and it was also testified that a reserve for operation of the system in the sum of $75,000 was necessary.

Furthermore, the record discloses that the $229,830.46 on hand included the first installment of 1938-39 taxes in the sum of $47,941.76, collected in advance to pay obligations of the District in 1939.

When these figures are kept in mind, it becomes obvious that there is substantial evidence supporting the trial court's finding as to the insolvent condition of the District, even conceding arguendo that the tax delinquency was only $185,423.44 as contended by the appellants.

But this is not all. It appears from the record that the agreement signed by the bondholders upon which the appellants rely as permanently reducing the interest payable on the District's bonds, was terminated by consent at the time the R.F.C. contract was made.

This transaction occurred in 1933, slightly over a year after the referred to agreement was completed, therefore the agreement remained in effect only that year. Thus it appears that the figure to be deducted from the $375,143.44 which the Court found as the delinquency in interest, is much less than $189,720 as contended for by the appellants.

■ Considering all these things, we find no merit in the appellants' assignment of error in the Court's finding that the District was insolvent.

## Fairness of the Plan

We come now to a consideration of the appellants' claim that the plan proposed by the District and approved by the court is "unfair, unjust and inequitable and discriminates against the appellants".

The first point under this heading is that "the plan of composition offers the R.F.C. bonds for 100% of their investment, which bear interest at 4%, while it requires the appellants to surrender their bonds and to take cash".

■ But appellants misconstrue the plan and the relationship existing between the District and R.F.C. A similar objection was made to the plan under consideration in West Coast Life Ins. Co. v. Merced Irrigation District, supra, and in reply we pointed out that R.F.C. contracted to furnish the money necessary to make the composition effective, and to accept in turn refunding bonds at 4% for the amount of its advance. But as holder of the old securities it is treated exactly as are all other bondholders. We hold against the appellants on this assignment of error.

■ Next it is urged that the plan of composition is unfair because the appellants' bonds all mature in the future, none of them maturing before the year 1946. It would seem to be the appellants' argument that even though a District is hopelessly insolvent and unable to meet the interest accruing on its obligations, it cannot take advantage of a plan of reorganization until such time as the principal of its obligations

becomes payable. The Bankruptcy Act does not so provide. Of course, the time of maturity of the bonds would be of evidentiary value in determining the ability of the District to pay its obligations, but the fact that the bonds all mature in the future does not in and of itself render a plan unfair.

The appellants also urge that the plan of composition is unfair "because the effective assets of the district greatly exceed its liabilities and because also of its long record of tax and water toll collections". We have answered this objection sufficiently in our discussion of the insolvency of the District.

The last objection of the appellants to the plan is stated by them in their opening brief "from the point of view of tax paying ability and of income and from the evidence supplied by such financial data as was supplied at the hearing, it seems conclusive that the district is able to pay vastly more than the composition figure".

This Court in the cases of West Coast Life Insurance Co. v. Merced Irrigation District, supra; Moody v. James Irrigation District, 114 F.2d 685; Bekins v. Lindsay-Strathmore Irrigation District, 114 F.2d 680, and Jordan v. Palo Verde Irrigation District, 114 F.2d 691, stated the test as to the fairness of the plan to be whether or not the amount to be received by the bondholders is all that they "can reasonably expect in the circumstances".

However, in the cited cases in which we held the various plans proposed to be fair, there was evidence as to the reasonable expectations of the District in the way of taxes to be collected, etc. In the Merced case there was introduced into evidence what was referred to as the "Benedict report", which entailed a scientific study of the tax paying ability of the District and represented about nine months of intensive work. In the James Irrigation District case there was testimony that the indebtedness provided for in the plan of composition "was well up to the limit of the ability of the lands in the District to meet". Similar testimony was introduced in the other cases referred to, and we held that in each case there was ample support for the trial courts' conclusions that the respective plans were fair and equitable.

Since our decisions in the cited water district cases were handed down, the Supreme Court decided the case of Consolidated Rock Company v. Du Bois, supra [312 U.S. 510, 61 S.Ct. 682, 85 L.Ed. 982], which case would indicate that in order to "exercise the 'informed, independent judgment' * * * which appraisal of the fairness of a plant of reorganization entails", the trial court should make some finding to support a conclusion that the payments provided for in the plan of composition are all that the District is reasonably able to pay in the circumstances.

So far as the record before us discloses, the District may have been in a position to pay more than the $.55 proposed, or again it may be that that sum is the maximum that the District could reasonably pay. But it is our opinion that the case should be remanded to the District Court to make the findings herein stated to be necessary, either with or without the taking of additional evidence as the Court in its discretion may determine.[2]

There is one more point in connection with the plan which we think it advisable to mention in passing. The plan proposed by the District provided: "The district proposes a composition of its present outstanding indebtedness by paying the holders thereof in cash the sum of 55 cents for each dollar of the principal amount of their respective claims, exclusive of interest, with deductions for missing coupons as follows: If any bond be presented for payment with any appurtenant interest coupon maturing on or before July 1, 1934, missing, there shall be deducted from the amount payable thereon 55 cents for each dollar of the face amount of such missing coupon, and if any bond be presented for payment with any appurtenant *unpaid* interest coupon maturing subsequent to July 1, 1934, missing, there shall be deducted from the amount payable thereon a sum equal to the full face value of such missing coupon; provided, however, that where deductions are made on account of missing coupons and thereafter such missing coupons are presented for payment, there shall be paid to the holder thereof an amount equal to the sums which were originally deducted from the sum paid on account of such bonds to which such coupons appertained". [Emphasis supplied.]

---

[2] We do not decide whether or not we would think it necessary to remand if the evidence before us were susceptible of but one construction, to-wit, that $.55 was the most that the District could pay.

640

The Court approved the plan in the same terms as the proposal. There is a dispute between the appellants and the District as to the meaning of the decree. We quote from the appellants' opening brief on the subject: "Now the appellee takes the position that a coupon which was paid under the judgments pleaded by the appellants, the payment being in full, and the coupon being surrendered, that it is now entitled to deduct for that specific coupon the full face value thereof, in spite of the fact that the decree uses the words 'unpaid interest coupons' indicating, it is claimed by appellants, that deductions should only be made for coupons which are missing or lost and not for coupons which are missing because they are paid and consequently in the hands of the district—being neither unpaid nor missing."

In the further proceedings of the trial court under the remand ordered hereby, the trial court should consider this dispute between the parties and clarify its decree.

The case is remanded to the District Court for further proceedings in accordance herewith.