ANACLETO MILLÁN SOTO, demandante-recurrido, *v.* CARIBE MOTORS CORP., demandada-recurrente.

Número: 12570. Resuelto: 19 de septiembre de 1961.

*Córdova & González y Robert E. Schneider, Jr.,* abogados de la demandada-recurrente; *Carmelo Avila Medina* y *Guillermo Díaz Díaz,* abogados del demandante-recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel, como Presidente de Sala, y los Jueces Asociados Señores Serrano Geyls y Rigau.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Anacleto Millán, pescador y vecino del lugar denominado Parcelas, de Ceiba, P. R., en consonancia con el espíritu de nuestros días, decidió ampliar su modesta actividad económica y se compró un camión usado. "En esos mismos días vino el relleno," Anacleto varió de idea y quiso cambiar el camión por otro nuevo y de mayor tamaño. (T. E. del demandante 18.) Al hablar del "relleno" se refiere el demandante Anacleto Millán al negocio de transportar tierra para relleno a la Base Roosevelt Roads. Es la compra de este segundo camión lo que motiva este pleito.

A fines de mayo de 1956 el demandante concurrió a la sucursal de Caribe Motors Corporation (la demandada) en Fajardo y expresó que deseaba comprar un camión Chevrolet modelo del 1956. (T. E. de la demandada 16 y 25.) En aquel momento la demandada no tenía un camión Chevrolet pero tenía en Río Piedras varios camiones GMC. Millán aceptó ir a Río Piedras con un vendedor de la demandada a ver dichos camiones y luego de así hacerlo compró uno de ellos.

Hay discrepancia en el precio y en cuanto a otros extremos entre el comprador y la vendedora, pero, en síntesis, el negocio se hizo sobre las siguientes bases. Millán dió $300.00 de contado y entregó el camión usado que él poseía. El balance lo pagaría en pagos mensuales conforme a un supuesto contrato de venta condicional.

Demos una ojeada rápida a la cronología de los hechos: Compró Millán el camión el 28 de mayo de 1956; por desperfectos mecánicos del mismo lo entregó a la vendodora en agosto de ese año; basándose en atrasos en los pagos de septiembre, octubre y noviembre del mismo año de 1956 la vendedora, teniendo el camión en su poder, radicó acción de reposesión en 7 de diciembre de 1956; en 8 de enero de 1957 se celebró la vista de la reposesión en el Tribunal de Distrito, a la cual no compareció Millán, y ese mismo día el Tribunal de Distrito dictó la Orden de Restitución, a los dos días, no siendo todavía firme la Orden de Restitución, el 10 de enero de 1957 Millán radicó en el Tribunal Superior una demanda contra la Caribe Motors Corporation solicitando la rescisión del contrato y la concesión de daños y perjuicios. Luego de verse el caso ante el Tribunal Superior éste declaró con lugar la demanda y ante nos recurre la demandada apelante. Continuemos ahora con mayor detenimiento.

En su demanda ante el Tribunal Superior Millán alegó que le compró a la demandada un camión "de tumba", modelo del año 1956 por $6,675.94; que firmó el contrato de venta condicional en blanco "con la confianza...de que se llenarían los blancos... tal y como se había acordado verbalmente por el vendedor y el comprador"; que la demandada no le dio copia del contrato de venta condicional, excepto que la primera vez que le entregó dicha copia fue como parte del procedimiento de reposesión; que el camión que se le entregó fue de modelo del 1955 y no del 1956; que dicho camión no rindió servicio al demandante por estar en malas condiciones mecánicas; alegó otras inexactitudes del contrato; que en

dicho contrato existió fraude y dolo de parte de la demandada; que por no haberle el camión dado servicio el demandante dejó de obtener ingresos por la suma de $3,000; que el camión fue entregado por él a la demandada y que se encontraba en poder de ésta desde hacía más de tres meses con antelación a la radicación de la demanda (la demanda es de 10 de enero de 1957). Solicitó el demandante que el tribunal decretase la rescisión del contrato, que se condenase a la demandada a restituir al demandante los $2,000 entregados por el demandante a la demandada (en un camión valorado en $1,700 y en $300 en efectivo) y que se condenase a la demandada a pagar $3,000 al demandante por ingresos dejados de percibir por el no uso del camión y $500 para gastos, costas y honorarios de abogado.

La demandada radicó una Moción de Desestimación alegando que el demandante pretendía atacar la validez del contrato de venta condicional estando aún pendiente ante el Tribunal de Distrito la acción de reposesión incoada por la demandada y que el demandante podía levantar cualquier defensa contra la demandada dentro del procedimiento de reposesión. Dicha moción fue declarada sin lugar por el Tribunal Superior. Contestó entonces la demandada negando las alegaciones esenciales de la demanda y alegando como defensa especial que la sentencia dictada por el Tribunal de Distrito en el procedimiento de reposesión era ya final, firme e inapelable. Se vio el juicio en su fondo en el Tribunal Superior con el resultado antes dicho.

Es útil a los fines de luego resolver el caso dejar ahora señaladas las peculiaridades de esta compraventa que nos ocupa:

1. El contrato de venta condicional fue firmado en blanco, en abierta contravención a la Ley de Ventas Condicionales que dispone que "Todo contrato de venta condicional se otorgará por escrito y no será firmado sinó *después* que contenga todo lo convenido por las partes" y añade dicha ley en ese

mismo artículo "No será inscribible *ni tendrá validez alguna* ningún contrato de venta condicional en el cual no se incluyan los requisitos aquí establecidos y en el que no aparezca constancia sobre la firma del comprador de habérsele *entregado copia del mismo.*" (Énfasis suplido.) 10 L.P.R.A. sec. 32 *Suplemento.* El citado artículo dispone además que en todo contrato de venta condicional se establecerán, entre otros requisitos, las siguientes partidas: el precio, el pronto pago, el balance adeudado, cargos por seguros, gastos de financiamiento, y por cualquier otro concepto, y el monto y número de los plazos a pagar. En caso de incumplimiento por parte del deudor no se podrá reclamar partida alguna que no estuviere especificada en el contrato. A Millán se le solicitó que firmase el contrato en blanco y a modo de explicación el vendedor le dijo "Esto hay que llenarlo en San Juan, donde van a hacer los números, tú sabes cuáles son". (T. E. del demandante 6.) Sobre esos números hay controversia.

2. Al comprador no se le entregó copia del contrato, también en violación de la ley, sinó hasta después de más de 6 meses de efectuada la compraventa, cuando ya Millán había devuelto el camión y cuando la demandada necesitó hacerlo para radicar la acción de reposesión.

3. El demandante, que no sabía de vehículos, ni siquiera conducirlos (su camión lo guiaba otro) y que no podía distinguir un camión del 1955 de otro de 1956, (T. E. del demandante 22) creyó que compraba un camión del 1956 pero obtuvo uno del 1955. La vendedora niega—no muy convincentemente—que engañara al comprador (T. E. de la demandada 26) pero el comprador así lo sostiene. El Tribunal de instancia dio crédito a la declaración del demandante y no encontramos razón para variar esa determinación. Fue el dueño de un garage de Ceiba, en donde Millán compraba la gasolina, el que informó al demandante que el camión no era del 1956 como él creía. En el contrato de venta condicional

aparece que el camión era del 1955—el contrato del cual no le dieron copia al comprador.

4. No hay duda de que la compraventa se realizó el 28 de mayo de 1956.([1]) Sin embargo el contrato aparece fechado a 17 de agosto de ese año. También hay discrepancia entre el demandante y la demandada en cuanto al pueblo en donde se firmó el contrato y en cuanto al precio y otras partidas del mismo, pero no es necesario entrar en esos detalles. (T. E. del demandante 3–5.)

El Tribunal Superior al declarar con lugar la demanda hizo las siguientes conclusiones de hecho: el precio del camión fue $6,550.94; Millán dio un pronto pago consistente en $300.00 en efectivo y en un camión que fue valorado en $2,200.00 y el remanente sería pagado en plazos mensuales; el contrato fue firmado en blanco por el comprador; fue firmado en Fajardo; no le dieron copia al comprador hasta que la vendedora inició el procedimiento de reposesión; los desperfectos del camión consistieron de roturas de los "espárragos" (tornillos que sujetan las ruedas), roturas en las cajas de bolas, el radiador y la tapa del bloque; debido a esos desperfectos el camión tuvo que ser llevado varias veces a reparar; en una ocasión el vehículo estuvo en poder de la demandada sin que el demandante pudiese utilizarlo debido a que la tapa del bloque hubo que mandarla a buscar a Miami; el demandante creyó que había comprado un camión del 1956 pero obtuvo uno del 1955; las cantidades del contrato fueron alteradas por la demandada cuando se llenaron los blancos; el camión que le entregaron al demandante resultó defectuoso; por esa razón el demandante devolvió el camión; al tiempo del procedimiento de reposesión ya el camión estaba en poder de la demandada; el demandante utilizaba el camión

___

([1]) El recibo del pronto pago (Exhibit 5 del demandante) dice: "Mayo 28, 1956, Recibí de Anacleto Millán Trescientos Dólares, parte pronto Truck G.M.C. $300.00 P. Laureano." Pablo Laureano fue el vendedor de la demandada que le vendió el camión a Millán (T. E. de la demandada 24).

para el acarreo del relleno para la Base Roosevelt Roads; el camión estuvo en poder de la demandada por más de cuatro meses; y si el demandante hubiese tenido el uso del camión durante ese tiempo hubiera recibido un ingreso de $30.00 diarios durante aproximadamente 120 días.

Como conclusión de derecho determinó el Tribunal Superior que la demandada a través de su sucursal en Fajardo y por sus conocimientos superiores en el ramo, engañó al demandante quien es una persona desconocedora del ramo al venderle un camión de un modelo atrasado y el cual resultó seriamente defectuoso. También concluyó que la demandada como vendedora es responsable de los defectos del camión y de los daños causados al demandante.

El tribunal sentenció a la demandada al pago de $2,500 cantidad que "entregará al demandante... por medio de un truck valorado en $2,200.00 y otros $300.00 en efectivo" y condenó además a la demandada al pago de $3,600.00, cantidad que dejara de percibir el demandante en su negocio, al pago de las costas y de $300.00 para honorarios de abogado. La demandada apelante alega que el Tribunal a quo erró:

1. Al privar "a la demandada de su propiedad sin el debido proceso de ley y le negó la igual protección de las leyes de Puerto Rico al no darle efecto concluyente a un decreto judicial definitivo entre las mismas partes."

2. "Al determinar como cuestión de derecho que la demandada, con conocimiento de causa, engañó al demandante al venderle un camión de modelo atrasado y el cual resultó seriamente defectuoso en su funcionamiento mecánico."

3. "Al determinar que la acción redhibitoria entablada por el demandante no estaba prescrita."

4. "Al determinar, como cuestión de derecho que la demandada es responsable por todos los daños causados al demandante."

5. "Al condenar a la demandada a entregar al demandante un truck valorado en $2,200.00."

6. "Al fijar la cuantía de los daños."

7. "En su apreciación de la prueba."

Tenemos ante nos una situación que considerada en sus méritos, a la luz de la prueba practicada y de las conclusiones a que llegó el Tribunal de instancia amerita consideración en su fondo. Sin embargo, la demandada nos presenta una defensa de naturaleza procesal—la alegación de cosa juzgada —que no podemos pasar por alto. Esa alegación es en esencia lo que ella plantea en el error número uno. Como estamos resolviendo a favor del demandante vamos a exponer nuestras conclusiones sobre los méritos del caso. Acto seguido atenderemos los errores señalados.

El contrato de venta condicional fue hecho en tan flagrante violación de la Ley de Ventas Condicionales que por lo menos es anulable. Artículo 2 de la Ley de Ventas Condicionales, 10 L.P.R.A. sec. 32, *Suplemento*. Art. 4 del Código Civil, 31 L.P.R.A. sec. 4; *Sánchez v. Coll.* 69 D.P.R. 925, 928 (1949). Además de las violaciones a la letra expresa de la Ley de Ventas Condicionales en que se incurrió, hubo dolo suficiente para viciar el consentimiento dado por el comprador y hacer así el contrato susceptible de ser anulado. Art. 1252, Código Civil, 31 L.P.R.A. sec. 3511.

A pesar de que se puede argumentar en estricta doctrina que el contrato es nulo (por haber sido ejecutado en violación de disposiciones expresas de ley fundadas sobre motivos de orden público) nos inclinamos a favorecer la teoría de la anulabilidad porque tenemos en cuenta la conveniencia práctica de vendedores y compradores condicionales y la del desenvolvimiento del comercio en general.

Estamos conscientes del gran volumen del tráfico de ventas condicionales en Puerto Rico. Se venden bajo ese sistema, entre otros artículos, automóviles y camiones, neveras, cocinas, televisores, máquinas de lavar, máquinas de coser, radios, calentadores de agua, equipo agrícola y muebles y enseres del hogar. Miles de personas están en algún modo

conectadas con la actividad de vender esos productos y muchos más son los compradores condicionales. Se estima que las ventas condicionales en el país montan alrededor de $100,000,000.00 anualmente.(²) Es posible que haya en la actualidad aquí en vigor muchos contratos de ventas condicionales que adolezcan de algunos de los defectos de que adolece el contrato de este caso. También es probable que en muchos de esos casos tanto los vendedores como los compradores estén satisfechos de la compraventa efectuada y aquellos que tuviesen motivos para, y el derecho de, levantar la cuestión de nulidad no deseen hacerlo y por el contrario deseen confirmar tales contratos, o que los hayan ya confirmado. No vamos a imponerle, por razones doctrinales, a esos miles de personas una nulidad absoluta que ellos no han solicitado y que les hará más daño que bien. Por eso escogemos la vía de la nulidad relativa o la anulabilidad.

█ Como se sabe, el acto nulo no produce ninguno de los efectos jurídicos que se proponía; el anulable los produce mientras no se anule. El acto nulo es insubsanable por razones de orden público, mientras que el anulable puede generalmente ser confirmado o subsanado por quién podría invocar el vicio o defecto del mismo. La nulidad relativa o la anulabilidad opera en favor de las personas que han cometido un error o contra las cuales se ha utilizado violencia, intimidación o dolo. La mejor forma de hacer efectiva esta protección no es declarando nulo el acto, porque tal remedio podría exceder su objetivo, sinó subordinar su mantenimiento a la voluntad del interesado. Si éste encuentra que el contrato es ventajoso, lo puede confirmar; sino, puede solicitar su anulación. Castán, *Derecho Civil Español*, 8a. ed., 1954, tomo 3, págs. 437-446; Puig Brutau, *Fundamentos de Derecho*

---

(²)*Estudio del Sistema de Ventas Condicionales en P. R.* rendido a la Comisión de Comercio e Industria de la Cámara de Representantes de P. R. por la Oficina de Servicios Legislativos de la Asamblea Legislativa, Mayo de 1961, pág. 31.

*Civil*, tomo 2, vol. 1, págs. 322–332; Guaroa Velázquez, *Obligaciones y Contratos*, mimeógrafo de la Universidad de P. R., 1939, págs. 113–116; *Zayas* v. *Orraca*, 80 D.P.R. 339, 351 (1957).

 Ante la situación de hecho y de derecho antes expresada la demandada nos presenta como su principal defensa la siguiente. El Tribunal Superior se vio confrontado con una sentencia final, firme e inapelable del Tribunal de Distrito dictada en el procedimiento de restitución a la cual debió haber dado efecto concluyente y debió haber declarado sin lugar la demanda de Millán.[3] Las defensas de éste debieron haber sido levantadas por él en dicho procedimiento y no podía invocarlas en el pleito en el Tribunal Superior. La demandada cita en apoyo de su posición los casos de *Mattei* v. *Maldonado*, 70 D.P.R. 468 (1949) y *Universal C. I. T. Credit Corporation* v. *Tribunal; Gatell, Interventor*, 77 D.P.R. 574 (1954).

En *Mattei* indicamos que existe conflicto en la jurisprudencia respecto a si en un procedimiento de reposesión entablado por el vendedor condicional, debe permitirse al comprador plantear las defensas de que existen vicios en el mueble vendido o que hubo incumplimiento del contrato por parte del vendedor, y dijimos que nos parece que la "mejor práctica" debe ser determinar dentro del procedimiento mismo de reposesión tales reclamaciones o derechos, más bien que limitarse al hecho escueto de si ha habido o no incumplimiento del contrato por parte del comprador y por ende si procede o no la reposesión solicitada. En *Universal* no expandimos ni restringimos lo dicho en *Mattei;* seguimos creyendo entonces y ahora que la mejor práctica es la antes expresada,

---

[3] Cuando Millán radicó la demanda en el Tribunal Superior la Orden de Restitución del Tribunal de Distrito todavía no era firme y por el contrario era apelable, porque Millán radicó la demanda a los dos días de haberse dictado la Orden de Restitución. Regla 3, Reglas de Apelación del Tribunal de Distrito al Tribunal Superior, *4 L.P.R.A. Apéndice III.* Cf. *Chase National Bank* v. *Colón*, 56 D.P.R. 297 (1940).

pero la situación de hecho en *Universal* era distinta y distinguimos ese caso del de *Mattei*. Sin embargo, la aquí demandada parece entender que al nosotros decir la "mejor práctica" dijimos la "única práctica". Suponer tal cosa es un error. Pueden darse situaciones como la del presente caso, que justifiquen apartarse de esa norma.

▆▆▆ La orden de restitución en el procedimiento de reposesión no constituyó cosa juzgada frente a la demanda de Millán en el Tribunal Superior porque se trata de dos causas de acción diferentes. La primera era la causa de acción del vendedor condicional basada en la falta de pago del comprador, mientras que la segunda era la causa de acción del comprador contra el vendedor basada en el dolo y en la nulidad del contrato. Conforme lo dicho en el caso de *Mattei*, supra, la mejor práctica hubiese sido litigarlo todo en el procedimiento de reposesión, pero al no hacerse así, el demandante Millán no quedó indefenso y podía incoar la acción de nulidad y de daños, como lo hizo. Nótese que el Código Civil (Art. 1204, 31 L.P.R.A. sec. 3343) exige que "para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquél en que ésta sea invocada, concurra *la más perfecta identidad* entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron." (Subrayado nuestro.) *Silva* v. *Doe*, 75 D.P.R. 209, 214 (1953). En el caso de autos falta esa perfecta identidad en las causas de acción de ambos procedimientos para que la sentencia dictada en el primero opere como cosa juzgada en el segundo.

▆▆▆ Tampoco es de aplicación la doctrina de impedimento colateral por sentencia ("collateral estoppel by judgment") porque bajo dicha doctrina la sentencia anterior es concluyente solamente en cuanto a aquellas materias que de hecho se suscitaron y verdaderamente o por necesidad se litigaron y adjudicaron, pero no es concluyente en cuanto a aquellas materias que pudieron ser pero que no fueron litigadas y

adjudicadas en la acción anterior. Freeman, *Law of Judgments*, 5th. ed., secs. 677–679; *Tartak* v. *Tribunal*, 74 D.P.R. 862, 871 (1953) y autoridades allí citadas; *Aetna Life Ins. Co.* v. *Martin*, 108 F.2d 824, 827 (1940); *Cunningham* v. *Oklahoma City*, 110 P.2d 1102, 1104 (1941); *Lorber* v. *Vista Irr. Dist.*, 127 F.2d 628, 634 (1942); *International Brotherhood of Electrical Workers* v. *Bridgeman*, 19 S.E.2d 667, 670 (1942).

■ Se ha dicho que la mejor prueba para determinar si una sentencia anterior es un impedimento para una acción subsiguiente es inquirir si la misma evidencia sería suficiente para sostener ambas acciones. Si para sostener las distintas acciones se necesita evidencia distinta entonces se trata de causas de acción diferentes y la primera sentencia no es impedimento para litigar la otra causa de acción. Freeman, op. cit., 687. En el caso de autos claramente la evidencia que se requería para demostrar el atraso en los pagos mensuales del comprador no es la misma que hubiese sido necesaria para sostener la acción de nulidad por defectos del contrato y por dolo que el comprador entabló.

■ Este caso se litigó estando vigentes las Reglas de Enjuiciamiento Civil de 1943 y las disposiciones supletorias a las mismas. Sin embargo, la Regla 13 (a) de 1943 sobre reconvenciones compulsorias no le es aplicable en virtud de la Regla 81, también de 1943, que al mencionar las acciones y procedimientos a que dichas reglas eran aplicables no incluyó el procedimiento de reposesión. Además, por la propia naturaleza especial y sumaria de dicho procedimiento no se le puede aplicar lo que disponía el Artículo 112 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 593 sobre reconvenciones. (Derogado por las Reglas de Procedimiento de 1958.) Dicho procedimiento de reposesión, como se ha dicho, es uno especial, que se inicia mediante una simple declaración jurada y no a virtud de una demanda ordinaria. Por su carácter sumario no está sujeto a los tecnicismos ni a las

demoras de que por lo general son objeto los pleitos civiles corrientes. *Universal Credit Corporation* v. *Tribunal,* 77 D.P.R. 574, 582 (1954). Debido a la naturaleza antes dicha de este procedimiento no podemos exigir de manera inflexible que se litiguen en él otras causas de acción ajenas a la reposesión. Las circunstancias de un caso como éste en que además de existir defectos formales fatales en el contrato —por ir contra la ley expresa fundada en motivos de orden público—concurre también el elemento del dolo, justifican apartarse, por excepción, de la norma general del caso de *Mattei,* supra.

Tampoco se aplicaría el Artículo 421 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 1793, sobre efecto concluyente de sentencia anterior ya que el mismo hace concluyente los fallos o decretos "en cuanto a la materia directamente juzgada" y en el caso de autos no se puede sostener que en el procedimiento de reposesión ante el Tribunal de Distrito se juzgó la acción de nulidad por dolo y por defectos del contrato que se litigó en el Tribunal Superior.

Es oportuno señalar que estamos conscientes de la utilidad y de la importancia de la regla de cosa juzgada y de la doctrina de impedimento colateral por sentencia. Ciertamente hay un interés tanto individual como social en que los litigios tengan fin. Sin embargo, no podemos frustrar la justicia en nombre de reglas que se originaron con el propósito de facilitar su administración. Las máximas generales hay que atemperarlas a los hechos del caso. Como bien señala el Presidente del Tribunal Supremo de España, Don José Castán Tobeñas, en su excelente libro *Teoría de la Aplicación e Investigación del Derecho,* (⁴) se invocan con frecuencia una serie de reglas doctrinales o aforismos jurídicos que aunque tienen "la apariencia de principios generales y absolutos no hay ni uno solo que no sea falso como máxima general." (⁵)

---

(⁴) Instituto Editorial Reus, Madrid, 1947.
(⁵) Castán, op. cit., págs. 253-258.

Señala Castán que los tratadistas modernos se pronuncian contra el abuso que se hace de tales aforismos. Por su parte, ya había escrito Don Felipe Sánchez Román que "Las especulaciones de los comentaristas y el uso de las escuelas de Derecho han consagrado una serie de reglas, que si bien revelan grande ingenio y ofrecen hábiles recursos para los debates académicos y forenses, sin dejar de asentarse en algunos casos en un fondo de innegable verdad, suelen ser entre sí contradictorias, se hallan desposeídas del sello de unidad que preside toda doctrina propiamente científica y prestan elementos para la defensa de toda clase de causas." ([6])

Como dijimos en *Pérez* v. *Bauzá*, 83 D.P.R. 220 (1961), "los tribunales se han negado a aplicar en forma inflexible la defensa de cosa juzgada cuando hacerlo derrotaría los fines de la justicia, especialmente si hay envueltas consideraciones de orden público" y "se inclinan hacia la solución que garantice cumplida justicia, en lugar de favorecer en forma rígida una ficción de ley que obedece fundamentalmente a un principio de conveniencia y orden procesal." ([7]) (Citas de autoridades omitidas.) Como señala Moore el procedimiento moderno tiende a estimular a los tribunales, si no es que se lo requiere, a decidir los casos en sus méritos. ([8])

---

([6]) *Estudios de Derecho Civil*, segunda edición, tomo 1, pág. 25.

([7]) Aunque el contenido de orden público de la Ley Núm. 13 de 12 de abril de 1955 que enmendó el artículo 2 de la Ley de Ventas Condicionales, 10 L.P.R.A. sec. 32 *Suplemento*, se desprende de su propia faz, véase sobre el particular el Informe de la Comisión de Comercio e Industria de la Cámara de Representantes sobre el P. de la C. 1124 de 8 de febrero de 1954 y la discusión de dicho proyecto, *Diario de Sesiones de la Asamblea Legislativa*, (Cámara) Núm. 93, de 17 de mayo de 1954, págs. 1844 a 1847; *Diario de Sesiones* (Senado) Núm. 53, de 23 de marzo de 1955, pág. 694; y *Diario de Sesiones* (Senado) Núm. 54, de 24 de marzo de 1955, págs. 710, 711 y 715.

([8]) Moore's *Federal Practice, 2d ed.*, 1960, *Part 5, par. 504*, pág. 5042. V. Barron and Holtzoff, *Federal Practice and Procedure, Vol. I revised*, 1960, sec. 7.

Por lo anteriormente expresado concluimos que no se cometieron los errores números 1 y 2. Tampoco se cometió el error número 3. Como señala la demandada en la página 5 de su alegato se trata realmente de una acción de nulidad de contrato. Dicha acción dura cuatro años. Artículo 1253, Código Civil, 31 L.P.R.A. sec. 3512; *Zayas* v. *Orraca*, supra. El contrato se celebró el 28 de mayo de 1956 y la acción se entabló el 10 de enero de 1957. No importa que el demandante la llamara de otro modo. "Ninguna parte en un procedimiento tiene un interés adquirido en los errores gramaticales y de procedimiento incurridos por su adversario." *Serra* v. *Autoridad de Transporte*, 68 D.P.R. 623, 629, (1948). Los errores 4 y 7 no se cometieron. Sí se cometió el error número 5. En vez de la demandada estar obligada a entregar al demandante un camión valorado en $2,200.00 deberá entregarle en su lugar la suma de $2,200.00 por ese concepto. La compraventa del camión nuevo GMC tuvo lugar en mayo de 1956. Fue entonces que el demandante dio a la demandada un camión usado valorado en $2,200.00 como parte del pronto pago del camión nuevo. La sentencia del Tribunal Superior es de enero de 1958. La demandada se dedica a la venta de vehículos y no es de esperarse que retuviese en su poder dicho camión usado dos años sin hacer ningún negocio con él. Declarada la nulidad de una obligación, cuando no hay posibilidad alguna de la devolución específica de la cosa, la misma puede sustituirse y en un caso como el de autos en que el camión se había valorado en una suma determinada cabe sustituir el camión por el valor que las partes le atribuyeron. Cf. *Forteza* v. *Colón*, 35 D.P.R. 293, 296 (1926) y Art. 1259 del Código Civil, 31 L.P.R.A. sec. 3518.

En cuanto al error número 6, si bien es cierto que se concedieron daños por ingresos dejados de obtener por el demandante por los cuatro meses que la demandada tuvo el camión en su poder sin descontarse los domingos y días feriados, en cambio no se concedieron daños por los ingresos deja-

dos de obtener por el demandante durante el tiempo que éste tuvo el vehículo en su poder pero que no lo pudo utilizar por estar dañado. Entendemos que el tribunal sentenciador compensó una cosa con la otra y no vemos razón para intervenir con esa decisión.

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de Humacao, con la modificación expresada en cuanto al señalamiento del error número 5.*

