## LEVER BROS. CO. v. ATLAS ASSUR. CO., Ltd., et al.

No. 7974.

Circuit Court of Appeals, Seventh Circuit.

Nov. 21, 1942.

Hayes McKinney, George H. Grear, and Hendrik Folonie, all of Chicago, Ill., and Glenn D. Peters, of Hammond, Ind. (C. Oscar Carlson, and McKinney, Folonie & Grear, all of Chicago, Ill., and Bomberger, Peters & Morthland, of Hammond, Ind., of counsel), for appellant.

Francis X. Busch and James J. Magner, of Chicago, Ill., and Richard P. Tinkham, of Hammond, Ind. (Taylor, Miller, Busch & Boyden, of Chicago, Ill., Tinkham & Tinkham, of Hammond, Ind., and Floyd S. Davis, of Cambridge, Mass., of counsel), for appellee.

Before EVANS and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge.

Lever Brothers Company, herein referred to as the plaintiff, sued the five defendant companies, herein referred to as the defendants, upon ten insurance policies covering loss or damage by explosion, and recovered a judgment below of $375,873.56.

There is no dispute as to the amount of the recovery if the plaintiff is entitled to recover at all. The alleged errors presented on this appeal are the overruling of the motion of the defendants to dismiss the complaint and their motion for a directed verdict; the admission of certain evidence and the refusal to admit other evidence; and the giving of certain instructions to the jury.

The plaintiff is a large soap manufacturer with a plant at Hammond, Indiana. Refined cottonseed oil is one of the products used by the plaintiff. To store it, large tanks are used. On the night of January 18, 1940 Tank 103 burst, and 6,292,000 pounds of refined cottonseed oil it contained spread over five and one-half acres of adjoining property. It was for the loss of this oil and for damage to property and the loss of use thereof that the plaintiff sued to recover under the policies.

The policies issued by the defendants were fire policies. Each of them contained a rider entitled "Extended Coverage Endorsement—Combined Coverage." The purpose of this rider was to make the fire policies cover loss by other perils, including explosion. The pertinent part of the rider covering loss by explosion is found in Special Condition No. 3, printed on the back of the rider, and reads as follows:

"(3) Special Conditions Applicable to Loss or Damage Caused by 'Explosion.'

"This Company shall be liable under this Endorsement for all direct loss or damage to the property and interest (s) covered hereunder caused by explosion, except for any loss or damage (whether or not caused by fire) occasioned by or incident to the explosion, collapse, rupture, or bursting of—(1) steam boilers or other pressure containers, and pipes and apparatus connected therewith, caused by internal pressure * * *."

The question presented by the motion for a directed verdict is whether or not the bursting of the tank was due to an explosion within the meaning of the policies.

The tank in question was constructed in 1936 by Stone and Webster, experienced engineers in this kind of construction. Mr. Wood, the resident engineer in charge of the construction of the tank, testified as to the manner of the tank's construction, and his testimony was not contradicted or even challenged. The tank was 60 feet in diameter and 50 feet high. It was made of fire-box steel, ranging from one-half inch thickness in the bottom course to one-quarter inch in the top. The bottom plate was of the same material and one-quarter inch thick. The plates forming the shell were welded together in the approved manner; the shell was welded to the bottom plate; and then angle irons were welded on the inside to further anchor the shell to the bottom of the plate. The tank stood on a concrete pile foundation two feet above the ground. There were two sets of coils, referred to as the north and south coils, that wound themselves over the bottom of the tank about six inches above the floor in the bended fashion of trombone tubes, and for that reason they were called trombone coils. They were connected by welding inside the tank to separate steam inlet pipes, and they were also connected to separate condensate outlets.

The only dispute as to workmanship or flaws in construction involved the weld of one of the inlet pipes to the coil. The defendants' evidence was that it was a poor weld with bad penetration and poor alignment, making it weak. The plaintiff's evidence was to the contrary, that the weld was good. Outside of this one dispute, there seems to be no controversy but that

the tank was made of sound material, with skilled and flawless workmanship, and in the approved manner.

The tank was built according to specifications, and they are not challenged. The tank weighed 230,000 pounds when empty.

Tank 103 was in a line of four tanks ranging in a general east and west direction, at a distance of four feet apart. They were all built about the same time and were of the same size and construction. To the south of these four tanks at a distance of 7 feet 6 inches were eight smaller tanks, and in line with them extending eastwardly were three more still smaller tanks. The space between the larger tanks to the north and the smaller tanks to the south was occupied by a heavy steel trestlework which carried the pipe lines to and from the tanks.

To the north of the large tanks was a railroad yard with six tracks, numbered 1 to 6 from north to south. Track 6 switched off Track 5 just opposite Tank 103. It was about 7 feet from the south rail of Track 6 to the north side of Tank 103.

Since October 11, 1939, 10,200,000 pounds of oil had been pumped into Tank 103 and over 3,000,000 pounds had been pumped out. On the morning of January 18, 1940 the temperature of the oil in Tank 103 was 87 degrees Fahrenheit. That day 57,000 pounds of oil were taken from Tank 103, and at the processing house the temperature was 71 degrees Fahrenheit.

On the evening of January 18, 1940 Tank 103 had about 39 feet of refined cottonseed oil in it. The steam had been on in the tank in both coils on January 17, and was cut off about 8:30 P. M. that evening. At about 2 P. M. the next day, it was discovered the north coil was frozen. Attempts were made to blow the pipes out with air, and when that failed steam was turned in, but the workmen were not able to thaw out the north coil. On inspection about 10:20 or 10:25 P. M. there seemed to be no unusual noise around Tank 103. The south coil was working normally. The north coil had been cut off entirely.

At about 10:30 P. M. January 18, 1940, Tank 103 burst. The temperature at this time was 14 degrees below zero.

At the moment of the catastrophe there was on Track 6 just opposite Tank 103 a slowly-moving locomotive and tender, with a crew consisting of the engineer, the fireman, the conductor and two switchmen.

Some tank cars were on the track farther north. The locomotive weighed 180,000 pounds, and the tender 130,000 pounds. At the time of the catastrophe, the engineer was in the locomotive cab on the right-hand side, next to Tank 103. The fireman was standing on the deck putting in a fire, and the conductor, Dyer, was walking on the ground between Tracks 5 and 6 about fifteen feet ahead of the locomotive. Brakeman Dillon was down the tracks to the east approximately 350 feet, and brakeman Mortenson was about 390 feet from Tank 103.

The account of what happened as observed by this switching crew and by employees of the plaintiff company was briefly as follows:

The engineer testified that he heard "a rumble immediately followed by a sort of blast. It seemed to lift the engine in the air and shake it," "like a rat terrier shakes a rat"; that "an earthquake or something" would shake it that way; "something violent going on"; that the engine came "down and immediately afterward something hit the engine," oil splashed on the engine, and the locomotive tender was thrown on its side. The engineer was in a daze.

The engine itself had been moved north 24 feet in the rear and 19 feet in the front. Glass in the cab windows was broken, as the engineer expressed it, by a "sort of a rush of wind," which occurred a couple of seconds before the shell of the tank hit the side of the locomotive.

The fireman testified he heard "a deep boom" that "the engine shook violently"; that the first noise "sounded like something broke"; "felt like the locomotive just blew up right under me."

The conductor testified that it "seemed like a blinding flash of light went across in front of my eyes, and then oblivion." When he came to he was lying on the ground immersed in oil. He said, "just felt like my ear drums were bursting."

Brakeman Dillon testified, "The first thing I heard was a loud boom and then the ground shook and rumbling, very loud rumbling sound along with it," that lasted one or two seconds; that his first thought was that it was an earthquake, and then he thought the engine had blown up.

Brakeman Mortenson testified that he was inside the scale house, with the windows and door closed. He heard a rumble

and boom, like two empty tank cars coming together with pretty good force.

Employees of the plaintiff testified as to what they observed. Employee Franklin was in the scale house and "heard a deep, muffled boom." He looked out and saw great clouds of steam rolling up, and immediately saw a wave of oil two or three feet high coming down the tracks.

Employee Ryerson was working in a building nearby, surrounded by noisy machinery. He heard a large boom, "it sounded just like thunder to me." He looked out and saw a "mountain" of oil some ten or twelve feet high coming down from the Tank Farm, and saw Tank 107 floating southeastwardly. The noise was a sharp clap and then a vibrating noise thereafter, like an explosion of any sort. He had heard a powder plant blow up when he was at a distance of seven or eight miles, and the noise he heard when Tank 103 burst sounded about ten per cent of that of the powder plant explosion.

Employee Werner, working close to Ryerson, heard "a loud noise like, a large boom."

Employee Swisher "heard a loud sound. It sounded like a bang" and shook him for a minute. He then saw Tank 107 shoot out at pretty full speed.

Employee Thomas, working in a building with machinery causing considerable noise, "heard a blast and the building kind of shook." He looked out the window and saw Tank 107 about 3 feet away from its base, and behind it "there was all kinds of things flying up in the air."

Employee Bernstorff said: "All of a sudden I heard this loud noise just like a short clap of thunder," and the building immediately vibrated. Machines in the building in which he worked caused vibration, but this was different and more distinct and lasted three or four seconds.

Employee Kristufek in a nearby building was testing some pipes by feeling them, when he "heard a rumbling sound and the pipes shook." The noise sounded like long range guns going off. There was a metallic boom and a rumbling.

Tank 104 after the catastrophe had a large dent in its side, and one side of the tank was off its base 18 inches. At this time it contained 2,300,000 pounds of oil, and the tank itself weighed 230,000 pounds. Tank 107 immediately south of Tank 103 was empty at the time but weighed over one hundred thousand pounds. It was moved off its base and came to rest 79 feet to the southeast. The steel trestle in between the large and small tanks was wrecked.

Tank 103 had popped open like a paper sack. There was an impact square break extending vertically 30 to 35 feet, and there was a ragged break extending from the square break to the top. The breaks did not occur in any of the vertical welds. The shell was completely torn from its bottom, with every possible kind of a break present. The metal base was dented and broken in about three or four feet from the shell and approximately opposite the line of breakage in the shell. The two separated edges of the tank were approximately one hundred feet apart. The roof had fallen down into the tank in a vertical plane. There was congealed oil on the inside walls of the tank, and evidence of oil on the inside of the roof, and on top of nearby tanks.

In addition to the above evidence of the physical facts and the phenomenon itself, there was expert testimony by three distinguished and well-qualified chemical engineers introduced by the plaintiff. These experts testified that the tank was caused to burst by an explosion occasioned by the presence in the bottom of the tank of a quantity of water that became superheated by the coils in the bottom of the tank and flashed into steam, which generated great power that liberated itself by wrecking the tank.

One of these experts (and all of them were in agreement as to what caused the catastrophe) testified:

"The casualty in the assumed tank in the hypothetical question could only have been accomplished by an explosion, or the liberation of very high instantaneous pressures at the bottom of the tank, under the oil."

The defendants produced well-qualified experts who testified that the catastrophe could not have happened as testified to by plaintiff's experts. Their theory was that there were present in that structure several different kinds of stresses, which they enumerated, in all about eleven, the accumulation of which amounted to such enormous pressure per square inch that the tank gave way and burst, and there was no explosion.

The defendants argued that their theory of the explosion as testified to by their

experts is just as reasonable as that testified to by the plaintiff's experts, that the jury had only a choice of probabilities, and that therefore their conclusion was one of guess and conjecture. The large amount of force accumulated by these enormous stresses might very reasonably have appeared to the jury to be unreasonable, especially in view of the fact that the plaintiff's experts very vigorously denied the existence of many of the stresses and the effect thereof. Such a conclusion would not have seemed unreasonable to us.

■ The jury was entitled to consider this expert testimony in connection with all the other evidence in the case. In doing so it had a right to consider the impression the explosion made upon the witnesses who saw, heard and observed it, the physical facts afterwards and the nature of the damage wrought, together with the reasonable inferences to be drawn from the facts proved. In the light of all this evidence, it was for the jury to say which of the two theories it would adopt. National Labor Relations Board v. Nevada Consolidated Copper Corp., 316 U.S. 105, 106, 62 S.Ct. 960, 86 L.Ed. 1305.

The jury could very properly have disagreed with the defendants that the defendants' theory was as reasonable as the plaintiff's. On the other hand, we think the jury might have accepted the defendants' theory that this bursting of the tank was due to the accumulation of all the stresses the defendants' experts testified were present. These great forces, the defendants' experts testified, caused the shell of this tank to burst, and it did burst with great force and violence.

Was this an explosion? What is the definition of an explosion? The court in its instructions to the jury treated of and defined the word "explosion" as follows:

"Hence an explosion is an idea of degree, and the meaning of the word in each case must be settled not by any fixed standard or accurate measurement but by the common experiences of men in matters of that sort. The term is to be construed in its popular sense as understood by ordinary men.

"Explosion means a sudden, violent bursting or breaking caused by an internal force and accompanied by a sudden or rapid expansion of air and a sharp noise or report. I am giving you several different definitions of explosion, gentlemen. Webster says, 'An explosion is defined to be the act of exploding, detonation, a violent bursting or expansion with noise following the sudden production of great pressure, as in the case of explosives, or a sudden release of pressure as in the disruption of a steam boiler.'

"While an explosion may be caused by combustion such may not be the only cause of the occurrence. Explosions may occur by reason of the creation, expansion and resulting pressure of steam as well as by ignition or combustion."

■ No question has been raised as to the propriety of this instruction. We are dealing with the word "explosion" in the way in which it is commonly accepted and understood. The insurance companies will not be heard to say that they meant by "explosion" anything more than the common understanding of the term. One of the common understandings of the term "explosion" is that there is a bursting of something with great noise and violence. Webster's definition, substantially the same, as the court's, is: "a violent bursting or expansion, with noise, following the sudden production of great pressure * * * or a sudden release of pressure."

The defendants' experts had testified that in this Tank 103 on that night there was an accumulation of stresses and strains, numbering about eleven in all, that exerted such great pressure and developed such force, and were in this confined, imprisoned state so unstable that, "any sudden outside agency might release the locked-up forces and cause a casualty."[1]

Defendants' witness Babcock testified: "* * * there may have been enough vibration from the locomotive to release those stresses, those energies, that were trying to get out of there, and once released the accident is all over."

■ If these great stresses confined in this tank, these great energies, were so unstable as to be capable of being set off by the vibration caused by the passage of a locomotive, and when released by such vibration were of such force as to burst that tank, that, the jury might very properly believe, was an explosion. So even under the defendants' theory, there was an explosion because there was a bursting with great force, noise and violence. The defendants' theory explains the accumula-

---

[1] The quotation is from defendants' brief.

tion of forces, the release of which produced the violent noise and bursting which accompany an explosion. The jury might very well have accepted the defendants' explanation of the way the thing happened and very properly have concluded that such a phenomenon was an explosion as they understood the word "explosion" and as the word had been defined for them.

The policies do not define what an explosion is. They only except explosions of certain kinds. The exception reads:

"Except for any loss or damage (whether or not caused by fire) occasioned by or incident to the explosion, collapse, rupture, or bursting of—(1) steam boilers or other pressure containers, and pipes and apparatus connected therewith, caused by internal pressure."

This exception, contained in Special Condition No. 3, which is the applicable provision of the policies, refers to steam boilers or other pressure containers. It is admitted by both sides that the tank in question was not a pressure container. We do not mean to say that every violent bursting is an explosion, but we do think that where there are great pent-up, imprisoned forces, in such a state of instability that the vibration of a passing locomotive is sufficient to cause their release with the force and violence testified to in this case, that is an explosion.

■ We think there was an abundance of evidence to support the claim that there was an explosion within the terms of the policies, and that there was no error in overruling the motion for a directed verdict.

The defendants contend there was error in the refusal of the court to admit defendants' Exhibit A in evidence. Exhibit A purports to describe the construction of Tank 103, to narrate and recount operating conditions prevailing before and after the explosion, and expresses the conclusion of the unnamed engineers of plaintiff and Stone and Webster that a water hammer set in operation the explosive force which destroyed the tank—a theory at variance with that taken by the plaintiff and its experts on the trial. Exhibit A is undated, unaddressed, and unsigned, and was prepared by unnamed engineers of the plaintiff and Stone and Webster. It was never shown to have been accepted or approved by the plaintiff. Its existence was made known to one of the defendants' investigating agents by one of the plaintiff's agents. They were both working at the time in an effort to adjust the claim and determine the amount of the loss and the question of liability. The parties had signed a non-waiver agreement under which they were operating at the time defendants' agents learned of the existence of Exhibit A and requested it of plaintiff's agent. It was furnished to defendants' agent at his request and with the understanding of both parties that it was given under the terms of the non-waiver agreement. The non-waiver agreement provided in substance as follows:

"(1st) That the defendants might make an investigation of the circumstances for the purpose of determining liability and amount of loss without having such acts considered as a waiver of the rights of either party; and

"(2nd) That both plaintiff and defendants, by all appropriate means, might take such action as was found necessary to determine the amount of the loss, and such action might be taken by either party without any prejudice, waiver or admission respecting coverage or liability."[2]

■ It will thus be seen that the non-waiver agreement provides that defendants might make an investigation as to liability and amount of loss without having such actions considered as a waiver of the rights of either party. Certainly when defendants' agent requested to be furnished with a copy of Exhibit A, the defendants were engaged in an investigation covered by the non-waiver agreement, and the receipt of Exhibit A was a part of that investigation and was an act in furtherance thereof. It could therefore not be considered as given unconditionally by the plaintiff, but only without waiver of plaintiff's rights under the agreement. Having received Exhibit A under the provisions of the non-waiver agreement and such action being within the terms thereof, the insurance companies will not be permitted to "eat their cake and have it too" by taking Exhibit A under a non-prejudicial agreement and then using it in a prejudicial manner.

■ We think for other reasons Exhibit A was not admissible and that no error was committed in excluding it. It had been prepared long after the accident, and purported to be the presentation of

---

[2] This quotation is taken from defendants' brief.

facts and the conclusions of certain of plaintiff's agents whose acts and conclusions were never shown to have been adopted or approved by the plaintiff, and were not part of the res gestae. Such narrative statements were not binding upon the plaintiff. Ohio & M. Ry. Co. v. Stein, 133 Ind. 243, 255, 31 N.E. 180, 184, 19 L.R.A. 733; Indianapolis Railways, Inc., v. Waters, 213 Ind. 527, 529, 12 N.E.2d 119; General Schuyler Ins. Co. v. Shustick, Ohio App., 40 N.E.2d 485, 486, 487; Lorber v. Vista Irrigation Dist., 9 Cir., 127 F.2d 628, 636; New York Life Insurance Company v. Rankin, 8 Cir., 162 F. 103, 108.

Neither did Exhibit A constitute an admission against interest as to the plaintiff corporation. Insurance Co. v. Mahone, 88 U.S. 152, 157, 21 Wall. 152, 22 L.Ed. 593; Burns v. Joseph Flaherty Co., 278 Pa. 579, 581, 123 A. 496.

■■ There is still another reason why we think no error was committed in the exclusion of Exhibit A. The trial court offered to admit the facts contained therein if separated from the opinions and conclusions of these unidentified authorities. The defendants declined the court's proposition and stated: "Well, we feel as to Exhibit A, either all should go in or none."

An examination of Exhibit A will readily disclose there was much in it that was not factual, and there was no foundation laid for the opinions and theories expressed and contained therein. Where competent and incompetent evidence are blended together and tendered as a whole, there is no error in excluding the whole. City of Terre Haute v. Hudnut, 112 Ind. 542, 549, 13 N.E. 686, 689; Indianapolis & M. Rapid Transit Co. v. Hall, 165 Ind. 557, 560, 561, 76 N.E. 242. There was no error in excluding Exhibit A.

■ Defendants have objected to the introduction of certain evidence as to the amount of water found in the emulsion in the bottom of Tank 103 when it was rubbed out or cleaned September 1, 1939. The evidence introduced over defendants' objections showed that after all the oil in Tank 103 had been pumped out except about 18 inches to 2 feet in the bottom, men got inside the tank and sloshed the oil and water around until it became a mixture that was then pumped out into other tanks. Of the 23,596 pounds removed and placed in Tank 221, there was 10.9%

water, and in the 136,160 pounds pumped out and placed in Tank 241 there was 1.81% water. The defendants' objection to the evidence is that the conditions surrounding Tank 103 on this prior occasion are not substantially similar to those on the occasion under inquiry. "Substantial similarity," to accept defendants' phraseology, is a relative term, and in its measurement the trial court has some discretion. There are no hard or fast rules as to what degree of similarity there must be to make the evidence admissible. If there is no similarity of conditions, then the evidence would be inadmissible. If there is some similarity of conditions, the weight of that evidence would be in proportion to the evidence of similarity, the greater weight to be given where there is greater similarity and the lesser weight where the similarity is less. But if there are valid points of similarity, as there were in the case at bar, such as the same tank and equipment, the same kind of oil handled in the same general way, refined in the same process, in which the same amount of water was used, and pumped through the same pipes (into which, when necessary, steam was blown to clear them out), and in view of the fact that there was direct testimony that such tanks when rubbed out always have water in the bottom, we think the evidence is admissible, and its weight was of course for the jury under all circumstances. Baber v. Rickart, 52 Ind. 594, 597; Lotz v. Scott, 103 Ind. 155, 157, 158, 2 N.E. 560; Beach v. Huntsman, 42 Ind.App. 205, 212, 85 N. E. 523; Hardin v. Cook, 181 Ind. 698, 703, 105 N.E. 231.

■ The complaint alleged loss by explosion, and it made no attempt to negative the exception contained in Special Condition No. 3 on the back of the rider. This pleading was challenged by a motion to dismiss, which was overruled. On the trial the court instructed the jury that the burden of proof as to whether the explosion was within the exception of the coverage was upon the defendants. The ruling on the motion to dismiss and the giving of instructions as to the burden of proof presented the same basic questions. Since it is admitted that the insurance policies are Massachusetts contracts, the construction thereof will be governed by Massachusetts law.

The face of the policies sued upon insured against an explosion "excluding cov-

erage provided for and enumerated under Item No. 3." Item No. 3 is contained in Special Conditions on the back of the endorsement and is headed:

"(3) Special Conditions Applicable to Loss or Damage Caused by 'Explosion.' "

The endorsement itself characterizes the clause as a Special Condition. This is a proviso to avoid general liability for explosion; it is not a provision providing insurance against explosion. It is a condition under which there would not be liability even if there were an explosion. It is one among many special conditions contained in the endorsement or rider. The rule in Massachusetts in such cases is well stated in Anthony v. Mercantile Mutual Accident Ass'n, 162 Mass. 354, 38 N.E. 973, 974, 26 L.R.A. 406, 44 Am.St.Rep. 367, as follows:

"The question in regard to the burden of proof has been considered and practically decided in previous cases. Freeman v. [Travelers'] Insurance Co., 144 Mass. 572, 12 N.E. 372; Coburn v. [Travelers'] Insurance Co., 145 Mass. 226, 13 N.E. 604; Badenfeld v. [Massachusetts Mut. Acc.] Association, 154 Mass. 77, 27 N.E. 769 [13 L.R.A. 263]. The substance of the contract is to pay if death results from injuries effected through external, violent, and accidental means, with a proviso stating many exceptions, most of which depend upon the subsequent conduct of the insured. While the use of the words, 'within the intent and meaning of the conditions herein recited,' may have been intended to have the same effect as if all the matters contained in the conditions had been written into the sentence descriptive of the risks insured against, and as if the general description of the risks had been in affirmative words, which would not include any of these excepted cases, and while there is logical force in the argument that the plaintiff should show affirmatively that his case comes within the terms of the policy by showing that the injury was not from any one of the excepted causes, we are of opinion that practically, and under the general rules of pleading, it is better to hold the plaintiff is not bound to allege or prove that his is not one of the cases to which the insurance does not apply. These cases, in whatever language they may be stated, are in the nature of exceptions under an affirmation previously stated in general terms. In this respect there is no good ground of distinction between the present

case and Freeman v. [Travelers'] Insurance Co. and Coburn v. [Travelers'] Insurance Co., cited above."

In the complaint the plaintiff alleged its injury and damage by explosion. The defendants responded, "Yes, but was it such an explosion as we insured against as shown by the special conditions," and assert that the plaintiff must plead and prove it was not within the condition. Such a contention the Massachusetts court met in Freeman v. Travelers' Ins. Co., 144 Mass. 572, 12 N.E. 372, 377, with this response:

"In an action upon a policy which contains many provisos and conditions there is a practical wisdom, which courts have recognized, in compelling the insurance company to allege and prove the want of compliance with any particular proviso or condition on which it relies."

 The special conditions here in question were not a part of the insuring clause but were in the conditions which limited the company's liability. Where the condition which purports to limit the liability previously set out in general terms appears elsewhere by rider or endorsement and is not an integral part of the insuring clause, then in such case the burden is upon the insurance company to plead and prove the condition that would relieve it from liability. There was no error in overruling the motion to dismiss or in the instructions as to the burden of proof. Freeman v. Travelers' Ins. Co., supra; Anthony v. Mercantile Mut. Accident Ass'n, supra; Coburn v. Travelers' Ins. Co., 145 Mass. 226, 13 N.E. 604; Red Men's Fraternal Acc. Ass'n v. Rippey, 181 Ind. 454, 103 N.E. 345, 104 N.E. 641, 50 L.R.A.,N. S., 1006; Goldfarb v. Maryland Casualty Co., 311 Ill.App. 568, 37 N.E.2d 376.

The defendants contend also that the court erred in its instructions by "singling out and giving undue emphasis to certain facts and circumstances favorable to plaintiff's theory of the case, and refusing to point out and give equal prominence to other facts and circumstances favorable to defendants' theory."

 We have examined the court's instructions, and we find no merit in the defendants' contention. The court did call certain facts to the jury's attention. The facts referred to preponderated by a slight majority in favor of the plaintiff. The court expressed no opinion, and the objection here is not that the court expressed

any opinion, but only that it over-emphasized the facts that were favorable to the plaintiff. The court fully instructed the jury that it was the exclusive judge of the facts, and that the court did not intend to intimate an opinion one way or another, and that if the court had, the jury should disregard it. The court should not take sides in its comment on the evidence, and the court most certainly did not in the case at bar. Neither is the court required to divide its comments between the facts supposedly favorable to the plaintiff and those supposedly favorable to the defendant with the exactness of an apothecary's scales. Where the court calls attention to certain facts and expresses no opinion, and further instructs the jury fully as to its province as to the finding of the facts, and disclaims any intention of expressing an opinion one way or another, as was done in this case, there is no error. Vicksburg, etc., R. Co. v. Putnam, 118 U.S. 545, 553, 7 S.Ct. 1, 30 L.Ed. 257; Calcutt v. Gerig, 6 Cir., 271 F. 220, 223, 224; Ross v. McLean, 56 App.D.C. 62, 10 F.2d 627.

The judgment of the District Court is affirmed.