Charles J. HEFFRON, Jr., Plaintiff,

v.

JERSEY INSURANCE COMPANY OF NEW YORK and Vincent Chicco, Defendants.

Civ. A. No. 3457.

United States District Court
E. D. South Carolina, Charleston Division.

Sept. 22, 1956.

**6**

Meyer, Goldberg, Hollings, Lempesis & Uricchio, Robert M. Hollings, Charleston, S. C., for plaintiff.

Robert McC. Figg, Jr., William H. Grimball, Jr., Charleston, S. C., for defendants.

WYCHE, District Judge.

In compliance with Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A., I find the facts specially and state my conclusions of law thereon, in the above cause, as follows:

### Findings of Fact.

1. The defendant Vincent Chicco has no interest in the above action; he has not appeared, and is, by consent, not a proper party to this action.

2. The defendant Jersey Insurance Company by its policy number 166J6095, dated December 3, 1948, insured the plaintiff Charles J. Heffron, Jr. against all direct loss from damage, not exceeding $12,000, to property of the plaintiff situated at number 47 Queen Street, in the City of Charleston, South Carolina, where such loss was caused by "explosion" and other specified perils.

3. The pertinent provisions of the policy of insurance are as follows: "Inherent Explosion Clause—This policy shall cover direct loss to the property covered caused by explosion occurring in the above described dwelling or appurtenant private structures or in any structure containing property covered hereunder from hazards inherent therein, but this Company shall not be liable for loss by explosion originating within steam boilers, steam pipes, steam turbines, steam engines, fly-wheels. * * * Extended Coverage. (Perils of Windstorm, Hail, Explosion, Riot, Riot Attending a Strike, Civil Commotion, Aircraft, Vehicles, Smoke, Except as Hereinafter Provided.) In consideration of the premium for this coverage shown on reverse side hereof, and subject to provisions and stipulations (hereinafter referred to as 'provisions') herein and in the policy to which this Extended Coverage is attached, including riders and endorsements thereon, the coverage of this policy is extended to include direct loss by Windstorm, Hail, Explosion, Riot, Riot Attending a Strike, Civil Commotion, Aircraft, Vehicles and Smoke. * * * Provisions Applicable Only to Explosion: Loss by explosion shall include loss resulting from the explosion of accumulated gases or unconsumed fuel within the firebox (or the combustion chamber) of any fired vessel or within the flues or passages which conduct the gases of combustion therefrom but this Company shall not be liable for loss by explosion, rupture or bursting of steam boilers, steam pipes, steam turbines, steam engines or fly-wheels, owned, operated or controlled by the Insured or located in the building (s) described in this policy.

"Any other explosion clause made a part of this policy is superseded by this Extended Coverage."

4. At about 11 o'clock p. m., on December 4, 1951, the insured premises of the plaintiff at number 47 Queen Street sustained severe damage from forces emanating from adjoining premises known as the Old Post Office Garage at number 49 Queen Street, and from pieces

of the material of which the Old Post Office Garage was constructed, which pieces were hurled upon and against the insured premises of the plaintiff.

5. The Old Post Office Garage at number 49 Queen Street, Charleston, South Carolina, was a two-story solid brick building having exterior walls approximately 18 inches thick; the building was approximately 100 feet long on its east and west sides and 40 feet wide on its north and south sides; the second floor of the building was supported by joists 40 feet in length extending from the east wall to the west wall of the building by which they were supported, and there were no center supports to the second floor; the roof of the building was of wood sheathed with tin supported by wooden trusses of mortise and tenon construction bearing on the east and west walls of the building and the east edge of the roof overhung the east wall of the building along which there was a gutter and the west edge of the roof was flashed into the west wall of the building, which continued on above the edge of the roof to form an escarpment, commonly known as a "fire wall".

6. The Old Post Office Garage building was of very old construction; the mortar in its walls was substantially weaker than that presently used in construction; but immediately prior to the event there was no evidence which would reasonably have indicated that the building was weak or about to collapse.

7. The Old Post Office Garage at the time of the event was empty and unused except by one or two individuals who were permitted by the owner to use the ground floor of the building for the parking of their vehicles.

8. The Old Post Office Garage contained an underground tank which had formerly been used for the storage of gasoline but which was unused at the time; in the center of the ground floor of the building there was a large open drain consisting of a box or sump 18 inches square and some 3 to 4 feet deep, into which opened a large pipe leading to the municipal drain system, and the building had no interior partitions or inclosures except in the northeast corner, where stairs were located, and an inclosure located south of the center of the building along the east wall where there was a wash room.

9. The east wall of the Old Post Office Garage at number 49 Queen Street was 25 feet 4 inches high; the east wall was 10½ feet away from and approximately parallel to the west wall of plaintiff's premises at number 47 Queen Street; it was 25 feet 8 inches from the western edge of the roof of plaintiff's premises at 47 Queen Street to the ground; the east wall of the Old Post Office Garage at number 49 Queen Street was 18 feet from the western edge of the back porch of plaintiff's house at number 47 Queen Street and 84 feet from the west wall of the Dock Street Theatre building which faced on Church Street around the corner; there was a two-car garage on plaintiff's premises which garage opened north and the west edge of the garage opening was approximately 4 feet from the southeast corner of the Old Post Office Garage building.

10. The Old Post Office Garage located at number 49 Queen Street was destroyed by cause or causes here in dispute, accompanied by a rumble or a roaring sound which persisted for some time and it was likewise accompanied by a single sharp noise which was described variously as a boom, a cracking sound or the sound of a bomb exploding.

11. The north and south walls of the Old Post Office Garage at number 49 Queen Street remained standing after the event but substantially all of the east and west walls of the building fell or were blown out so that the east wall of the building went to the east and the west wall of the building went to the west.

12. The forces involved in the destruction of the Old Post Office Garage at number 49 Queen Street were such as to propel large pieces of brick, almost whole brick in size, and several in number, together with considerable pieces of

mortar and finer debris upon the tin roof of plaintiff's residence at number 47 Queen Street and the mortar and bricks struck the roof with such force as to dent and puncture the tin covering of the roof.

13. The force or forces involved in the destruction of the Old Post Office Garage crushed in the gutter along the west edge of plaintiff's roof and filled it with small pieces of brick and debris.

14. The force or forces involved in the destruction of the Old Post Office Garage knocked in window sashes and screens from the second-story window of plaintiff's house on the west side near its southern corner, knocked apart and loosened the window-casing of the window and the weather-boarding and framing of the house in the area of the window, and it knocked in the rear-half of the first floor of plaintiff's west wall completely, including windows, studs, framing, interior walls and exterior sheathing.

15. The force of the destruction of the Old Post Office Garage moved plaintiff's two-story frame dwelling, measuring approximately 25 feet in width by 50 feet in length, over on its foundations one to two inches visibly cracking bricks on the foundation piers of the building and causing plaster cracks in the house, some of which were over two inches in width, and causing separation of the walls from the studs in various portions of both floors of plaintiff's premises.

16. Forces present in the destruction of the Old Post Office Garage were such as to propel bricks upon the second floor of plaintiff's back porch some 18 feet away, visibly marking and gouging the west columns of plaintiff's back porch up to a point 18 feet 8 inches above ground level.

17. The force further damaged plaintiff's back porch in these particulars: The west railings of both the first and second floors of the porch were knocked completely down; the bottom of the westernmost column of the second floor of the porch was moved to the east several feet, knocking the easternmost column of the porch, by which it was connected by railings, completely loose from the porch both top and bottom.

18. The glass window panes in the windows in the north and south walls of the Old Post Office Garage at the second floor level were still intact after the event.

19. The force or forces involved in the destruction of the Old Post Office Garage hurled brick and debris to within a few feet of the Dock Street Theatre wall, which lay some 84 feet distant to the east.

20. The force or forces involved in the destruction of the Old Post Office Garage building were such as to cause a breaking of structural members of the building, including several of the roof trusses.

21. The force or forces involved in the destruction of the Old Post Office Garage were such as to propel bricks and debris into the first floor nursery of plaintiff's dwelling with such force as to penetrate and destroy the west wall of the room and to propel the debris and the contents of the room up against the inner wall of the room.

22. At the conclusion of the catastrophe the center point of the east wall of the Old Post Office Garage building was found to have disintegrated down to a point 3½ feet above the ground, but to the rear or south of the center of the building, the east wall had disintegrated right down to ground level.

23. As a mathematical proposition, if the eastern wall of the Old Post Office Garage had fallen in an intact mass from a point 3½ feet above ground level, it would have fallen in an arc having a radius of 21 feet 10 inches and would have struck plaintiff's residence at a point approximately 21.6 inches below the bottom of the gutter and over 2 feet below the top edge of the gutter or the western edge of plaintiff's roof.

24. As a mathematical proposition, if the east wall of the Old Post Office Garage opposite the back porch of plaintiff's residence had fallen in an intact mass from a point at ground level, it

would have struck the second floor column of the porch at a point approximately 17 feet above ground level.

25. The breaking of structural members and roof trusses of the destroyed building were not of an extent nor predominantly of a character which could have exerted upward and outward forces against the brick work of the east wall of the building and were not of the extent or character which could have flicked bricks and loose mortar onto plaintiff's roof or into plaintiff's gutter, when due regard is had to the height and distance of plaintiff's building, to the quantity and size of the debris deposited on plaintiff's roof and in his gutter and to the fact that the force of the debris was sufficient to puncture plaintiff's tin roof.

26. Due to an outward movement of the weakened west wall of the Old Post Office Garage building the western ends of the roof trusses and the western ends of the floor joists lost their bearings on the west wall, and the western edge of the roof and of the floor fell suddenly in an arc downward and eastward entrapping and creating a build-up of air pressure within the building, which pressure, when exerted against the east wall of the building, caused the east wall suddenly to burst and rupture and, in effect, blasted a portion of the east wall outward and upward against and upon plaintiff's residence.

27. The aggregate amount of damages to the plaintiff's premises growing out of forces involved in the destruction of the Old Post Office Garage building was $5,895.

28. Plaintiff's loss occurred on December 4, 1951; plaintiff duly filed his proof of loss with defendant on February 25, 1952, and on May 15, 1952, the defendant refused payment of plaintiff's claim.

Conclusions of Law, Opinion and Order.

The plaintiff has the burden of proving the facts relied upon by him necessary for his recovery.

In arriving at the foregoing facts, I have excluded from my consideration the so-called "expert testimony" offered by the plaintiff and ruled as inadmissible by me during the course of the trial.

Insurance policies are generally, and with good reason, interpreted in favor of the insured. The rule and the reason therefor are well expressed in 29 Am.Jur., Insurance, § 166, pages 180, 181 and 183: "The general rule applicable to contracts generally, that a written agreement should, in case of doubt as to the meaning thereof, be interpreted against the party who has drawn it, is very frequently applied to policies of insurance and constitutes an important rule of construction in such respect, in view of the fact that ordinarily, and in practically all cases, it is the insurer who furnishes or prepares the policies used to embody the insurance contracts. The general rule is that terms in an insurance policy, which are ambiguous, equivocal, or uncertain to the extent that the intention of the parties is not clear and cannot be ascertained clearly by the application of the ordinary rules of construction, are to be construed strictly and most strongly against the insurer, and liberally in favor of the insured, so as to effect the dominant purpose of indemnity or payment to the insured, especially where a forfeiture is involved, since the forfeiture of insurance policies is not favored by the courts. * * * It has been deemed that an insurer should not be allowed, by the use of obscure phrases and exceptions, to defeat the very purpose for which the policy was procured."

In the construction of insurance contracts, it must be remembered that the courts should not ignore the fact that the primary object of all insurance is to insure, and that, in cases of doubt, uncertainty, manifest ambiguity, or susceptibility of two equally reasonable interpretations, since the language used is the selection and arrangement of the insurer, such contracts must be liberally construed in favor of the insured. Parker v. Jefferson Standard Life Ins. Co., 158 S.C. 394, 397, 155 S.E. 617. Insurance policies are drawn by the legal ad-

visers of the insurance company, who study with care the decisions of the courts, and, with such decisions in mind, attempt to limit as narrowly as possible the scope of the insurance. It is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured and against the insurance company. Manufacturers' Accident Indemnity Co. v. Dorgan, 6 Cir., 58 F. 945, 956, 22 L.R.A. 620.

■ The cardinal principle in interpreting insurance policies is that applicable to the interpretation of contracts in general, and that is, they must be interpreted as nearly as may be in accordance with the intention of the parties.

■ Usually the parties in using words in an insurance contract are deemed to have used the word in accordance with the ordinary meaning of the term. But it is otherwise where the language of the policy or the circumstances of the parties indicate a different intention.

In the case of Mitchell v. Potomac Insurance Co., 1901, 183 U.S. 42, 22 S.Ct. 22, 46 L.Ed. 74, the insurance company was exempted from liability for losses growing out of explosions, and in specifying this exemption, the policy used no qualifying terms to indicate that the word "explosion" was used in anything but its ordinary sense. In this case, plaintiff sought to avoid the policy exemption by claiming that gasoline fumes in his cellar had not exploded in the presence of a lighted match, but had merely burned rapidly, producing a sudden expansion of hot air which suddenly again cooled and created a vacuum which caused the cellar to fall in, and the Court, quite rightly, submitted plaintiff's theory to the jury with the instruction, which in that case was proper, that the term "explosion" as used in the policy was intended to be used in its commonly accepted meaning. The Court held that there was no error in this instruction.

In the case of Hartford Fire Ins. Co. v. Empire Coal Min. Co., 8 Cir., 30 F.2d 794, the Court had before it a policy by which the insurance company was liable for losses caused by "underground explosions". This and other terminology of the policy indicated that the policy was intended and the parties anticipated that it would apply to a coal mine. The Court permitted recovery by the plaintiff, interpreting the policy most liberally in favor of the insured, and in so doing held that the term "explosion" as used in the policy, was not intended in its ordinary or popular sense but in a sense as accepted and understood in coal mining operations, i. e., there was an explosion even though there was no *noise, blast* or *violence.*

The policy involved in this case uses special language to define "explosion" as intended therein. The policy of insurance, after imposing liability for loss caused by "explosion" without limitation as to its meaning, further therein listed certain "explosions" included and certain "explosions" excluded in the policy, and provided: " * * * this Company shall not be liable for loss by *explosion, rupture or bursting of steam boilers, steam pipes, * * * or fly-wheels."* (Italics added.) By adopting these words, the insurer, who was the author of the policy, apparently regarded the word "explosion", as used in its policy, as encompassing within its meaning the flying apart of fly-wheels and other similar violent ruptures or bursting.

The provisions of the policy here involved are commonly met with today in fire and extended coverage insurance policies involving commercial and residential property, and I have sought as an aid in interpreting this policy the interpretations of other courts of similar policies.

In Commercial Union Fire Ins. Co. of New York v. Bank of Georgia, 5 Cir., 197 F.2d 455, 456, the plaintiff, seeking recovery under an explosion provision of an insurance contract similar to that here involved, proved that its damages resulted from rupture of a water main, produced by "water-hammer". The defendant, on the other hand, contended that an explosion necessarily involved a

change of the chemical or molecular structure of a substance under heat or chemical reaction and that so defined, "water-hammer" was not an explosion. The Court, rejecting this contention, and permitting recovery, said: "An explosion is a rapid, sudden, and violent expansion of air or relinquishment of energy, causing a rupture and accompanied by a loud noise, not necessarily extremely loud. Fire is perhaps the principal cause of explosions, but they may be produced without the aid of fire. A flywheel may explode from excessive speed if its governor breaks. Even severe frost often causes trees to explode. It has been said that there is no difference in ordinary usage between explode and burst; the ordinary idea is that the explosion is the cause while the rupture is the effect. 1 Bouvier's Law Dict., Rawle's Third Revision, page 1161, citing United Life, Fire & Marine Ins. Co. v. Foote, 22 Ohio St. 340, 348; Evans v. Columbian Ins. Co., 44 N.Y. 146, 150. The acts that constitute an explosion within the meaning of the extended coverage provision of this policy must be determined from the language of the policy, the ordinary uses of the word, the common experience of men, and their general notions in matters of this sort. One of the definitions in Webster's dictionary for the verb *explode* is to 'burst noisily.' In Louisville Underwriters v. Durland, 123 Ind. 544, 24 N.E. 221, 223, 7 L.R.A. 399, the court said that the bursting of a boiler and the explosion of a boiler were one and the same thing. In 35 C.J.S., Explosion, p. 215, note 3, it is said that an explosion may be produced by the sudden liberation of air from an air gun.

\* \* \* \* \*

"The appellant argues that the only similarity between a water-hammer and an explosion is that they both generally make a noise. There is another similarity, we think, which is that in both instances the bursting is caused by excessive pressure, and the pressure is caused by pent-up energy. The difference is that in steam boilers the excessive pressure is caused by heat or fire, while in water-hammers it is caused by energy generated by the speed of moving water. It is the sudden release of energy in both cases that causes the explosion. Energy is known to science only by its effects. The appellant having charged an additional premium for coverage to include explosion, with an exclusionary clause as to explosions originating within steam boilers, etc., and having provided that every other explosion clause in the policy was superseded by said endorsement, we have here a policy provision for insurance against loss or damage by explosion in the unrestricted use of the word, except only as to an explosion orginating within steam boilers, pipes, etc., connected therewith and operated thereby."

In the case of L. L. Olds Seed Co. v. Commercial Union Assurance Co., 7 Cir., 179 F.2d 472, there was presented to the court a factual situation substantially similar to that presented in Commercial Union Fire Ins. Co. of New York v. Bank of Georgia, supra. In a sense, this was a more difficult case for recovery than the Commercial Union Fire Insurance case, because there was involved a pipe which ruptured while no one was present and there was no evidence of noise or violence. Furthermore, there was no going away of material from the center of the rupture as had occurred in the Commercial Union Fire Insurance Co. case. Meager factual circumstances were accepted as evidences of an explosion in the absence of any other reasonable explanation.

Policies similar to that involved in this case were construed in Lever Bros. Co. v. Atlas Assur. Co., 7 Cir., 131 F.2d 770, where the violent rupture of a cottonseed oil storage tank was of such magnitude as to move a locomotive and tender on adjoining tracks some 20 or more feet. Here there was no evidence of the ignition of either the oil or fumes from the oil nor was there any evidence that the cottonseed oil was spontaneously explosive. Instead, the parties produced expert witnesses who testified as to

divers theories as to what had happened. Expert witnesses presented by the plaintiff testified that the tank was caused to burst by an explosion occasioned by the presence in the bottom of the tank of a quantity of water that became super heated by warming coils in the bottom of the tank and flashed into steam. The defendants, on the other hand, produced well qualified experts who disputed plaintiff's theory and who testified that there were present in the tank about eleven different kinds of structural stresses, the accumulation of which amounted to such enormous tensions and pressures that the vibration of the passing locomotive was sufficient to cause their release by the violent rupture and bursting of the tank. The Court held that, as the term "explosion" was used in the policies, the jury would be justified in returning a verdict for the plaintiff, based upon its adoption of either the plaintiff's theory or the defendant's theory as to its cause.

In Bower v. Aetna Ins. Co., D.C.N.D. Tex.1944, 54 F.Supp. 897, there was involved a motion to dismiss the insured's complaint on the ground that it failed to allege sufficient facts to justify recovery. The complaint alleged that upon the return of the plaintiff to his home " 'he found that there had been an explosion, or explosions, of some kind by which some of the radiators connected to and constituting a part of the hot water circulating system, had been shattered, broken, and parts thereof had been hurled across rooms of said house and water had leaked out, or had been blown out therefrom and frozen upon the walls, floors, stairs and ceilings of said house, causing the damage * * *. That the explosion, or explosions * * * were of a violent nature and were internal explosions from within outward, and hurling portions of said heating system away from and out of the said radiators and hurling portions of the iron of which it was composed, from two to fifteen feet across the room * * * that the origin of said explosion, or explosions, is unknown to plaintiff * * * but [he] alleges that the explosions which actually took place and caused the damages herein complained of were explosions within the meaning of the term explosion as used in the policy' ".

In moving to dismiss, it was the defendant's contention that the complaint failed to allege what force or forces caused the explosion. In overruling defendant's motion to dismiss, the Court stated that it could be easily inferred from circumstances disclosed in the complaint that what had happened was that the water in plaintiff's radiator pipes froze and, in the process of freezing, expanded so as to explode or burst the pipes and that this resulted in plaintiff's damage, and that this occasion would be an explosion in the broad sense in which insurance policies of this nature are interpreted.

In Hulcher Soya Products, Inc. v. Millers' Mutual Fire Insurance Association, 1955, 5 Ill.App.2d 235, 124 N.E.2d 570, the Appellate Court reversed judgment on a verdict against the Insurance Company. Whether the insurance policy involved in that case used the term "explosion" in the same sense as that in which the term was used in the policy in the case at bar, does not appear in the opinion. It does appear, however, from the opinion that the Court, in its instructions to the jury, defined the necessary elements of proof of an explosion as follows: "1. A sudden accident bursting or breaking, 2. That such bursting or breaking, if any, was caused by a suddenly developed internal force; 3. That such bursting or breaking, if any, was accompanied by a sudden or rapid expansion of air; and, 4. That such bursting or breaking was accompanied by a sharp noise or report." There is no indication that the foregoing instruction to the jury was objected to, and it apparently represented the law of the State of Illinois with respect to insurance policies expressed in the terms present in the policy involved in that case. The Appellate Court in that case reviewed the record and found that, since there was no testimony that the bursting or breaking of the grain elevator was

"accompanied by a sudden or rapid expansion of air", there could be no recovery.

That the existence of an explosion necessitates such "an accompanying sudden or rapid expansion of air" does not find support in any of the other cases cited above and certainly "a sudden or rapid expansion of air" would not be present in such explosions covered in the policy in the case at bar represented by the flying apart of fly-wheels. The policy involved in the Hulcher Soya case, therefore, clearly is not that presented in the case at bar, and the results of that case should not therefore be controlling here.

Similarly, Westchester Fire Ins. Co. of New York v. Chester-Cambridge B. & T. Co., 3 Cir., 91 F.2d 609, 611, cited by the defendant, is not controlling here because the policy in that case did not insure against loss by explosion.

I must, therefore, conclude that the word "explosion", as used in the policy of insurance involved in this case, includes in its scope a rapid, sudden and violent relinquishment of energy causing a rupture accompanied by a loud noise.

Applying this definition of "explosion" to the facts in this case, I conclude, as a matter of law, that the policy of insurance here involved covered loss suffered by plaintiff growing out of forces involved in the destruction of the Old Post Office Garage building.

Plaintiff contends that he is entitled to interest on the amount due from the date of defendant's refusal to pay the claim, on the ground that this refusal constituted a breach of contract, and that it is a proper element of his damages that he be compensated for the money and the use of the money to which he was entitled under his contract on that date. I find that, as a matter of law, plaintiff is entitled to interest at the statutory rate of six per cent. per annum from May 15, 1952, to date. Concordia Ins. Co. of Milwaukee v. School Dist., 282 U.S. 545, 51 S.Ct. 275, 75 L.Ed. 528; Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 65 A. 134, 8 Ann.Cas. 298; 154 A.L.R. 1356, Annotation 1363, 1382–1385; 29 Am.Jur., Insurance, 1955 Cumulative Sup., p. 163, Note 13, under Section 1182.

In accordance with the foregoing Findings of Fact, and Conclusions of Law, it is my opinion that judgment should be entered for the plaintiff Charles J. Heffron, Jr. against the defendant Jersey Insurance Company of New York, in the sum of $5,895, with interest at the rate of six per cent. per annum, from the 15th day of May, 1952, to date, and

It is so ordered.