John P. HARPER, Administrator of the Estate of W. B. Harper, Sr., Bertie E. Harper, W. B. Harper, Jr. and Peggy J. Harper, Plaintiffs,

v.

PENN MUTUAL FIRE INSURANCE COMPANY OF WEST CHESTER, PENNSYLVANIA, Defendant.

Civ. A. No. 3376.

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 15, 1961.

MacKenzie & Babb, John A. MacKenzie, Portsmouth, Va., for plaintiffs.

White, Ryan & Reynolds, Edward L. Ryan, Jr., Norfolk, Va., for defendant.

WALTER E. HOFFMAN, Chief Judge.

Defendant issued to plaintiffs its policy of insurance in the sum of $30,000.00, covering, *inter alia,* damage by windstorm on the property owned by plaintiffs at 820-832 Douglas Avenue, Portsmouth, Virginia. The only controversy is the extent of the loss. Plaintiffs instituted this action in the state court, claiming $25,000.00, and the proceeding was properly removed to this Court, where the *ad damnum* was subsequently increased to $27,764.82.

On June 7, 1961, the matter was heard by a jury which returned a verdict in the sum of $20,000.00, plus interest from November 18, 1960. The date that interest was to commence was agreed upon by counsel. While the application of the co-insurance clause had not been specially pleaded, the Court, over objection of plaintiffs, permitted an oral amendment after trial in view of the stipulation of counsel that the application of the co-insurance clause would be determined by the Court on the evidence presented at the jury trial.

The policy provides for an eighty percent co-insurance clause, i. e., the company and the insured agreed that the company would "not be liable for a greater proportion of any loss" than the sum insured ($30,000.00) bears to eighty percent "of the actual cash value of said property at the time such loss shall happen, nor for more than the proportion which this policy bears to the total insurance thereon."

In its desire to minimize the damage caused by windstorm the defendant valiantly endeavored to reduce the value of the insured property. The various appraisals as to value were furnished by plaintiffs' witnesses[1]—J. J. Smith and J. L. Smith, who are not related. The testimony of J. J. Smith is not as clear as that of J. L. Smith as to the "actual cash value" at the time of loss. His method of determination in arriving at a figure of $35,000.00 was not thoroughly explored. The witness, J. L. Smith, with 40 years experience as a general contractor and prior service as an assessor and member of the Equalization Board, is more direct. In response to an inquiry, J. L. Smith fixed the value of the building immediately prior to the storm damage at from $30,000.00 to $35,000.00. Another witness, Aubrey Sweet, determined the depreciated value of the building at $34,500.00, approximately 18 months prior to the storm. These witnesses were not extensively cross-examined as to these stated values, for to endeavor to establish a greater value may well have increased the loss in the minds of the jurors. Nevertheless, ample opportunity was afforded the defendant to show that the actual cash value of the building was in excess of the amounts given by the witnesses, either through the process of cross-examination or independent testimony.

Admittedly the Court, as the trier of fact respecting the application of the co-insurance clause, may determine from the evidence the actual cash value of the property. Defendant urges that, by applying the theory of replacement cost less depreciation, we arrive at a "true value" which is greatly in excess of the "actual cash value" as indicated by plaintiff's witnesses. The policy does not define what is meant by the term "actual cash value". That replacement or reproduction cost, less depreciation, is an important factor in determining "actual cash value" cannot be denied. 61 A.L.R. (2d) p. 726, § 7(b). In some jurisdictions the term is synonomous with "market value". 61 A.L.R. (2d), p. 725, § 7(a). Of more recent date, there has been a tendency to reject the foregoing two tests as the sole test or criteria of the "actual cash value" of buildings, with courts adopting the broad evidence rule. Stated otherwise, the broad evidence rule permits the introduction and consideration of any evidence logically tending to the formation of a correct estimate of the value of the destroyed or damaged property for the purpose of ascertaining the "actual cash value" at the time of loss. 61 A.L.R. (2d), p. 718, § 5, p. 729, § 7(c). In the absence of a controlling Virginia decision, this Court adopts the broad evidence rule, as strict adherence to either of the recognized tests of "market value" or "reproduction cost less depreciation" will merely serve to shackle the trier of fact in all cases. The difficulty with the "actual market value" test is that a hypothetical sale would have to be established as instances of sales of buildings, independently of the land upon

---

[1]. A thoroughly competent appraiser, A. P. Grice, III, appeared in court in response to a subpoena issued by defendant, but was not called to testify.

which they stand, are scarcely ever the subject of market sales. To adopt the "reproduction or replacement cost, less depreciation" theory may well result in an inflated value, particularly where the specialized use of the property has been abandoned or otherwise modified.

█ Defendant argues that an offer of $85,000.00 for the purchase of the property made approximately four weeks prior to the storm, and a subsequent decrease in said offer to $50,000.00 after the loss, is cogent evidence of the actual cash value immediately prior to the storm. The vice in this contention is that the offer included 32 building lots surrounded on all sides by paved roads. No attempt has been made to break down the offer to determine the portion allocable to the damaged building. Evidence touching upon the offer to purchase, either before or after the storm, is of no consequence.

█ Plaintiffs and defendant are in disagreement as to the burden of proof in establishing the "actual cash value" of the building for determining the applicability of the co-insurance clause. Defendant urges that the co-insurance clause is a condition of the policy and hence the burden rests upon the plaintiffs. Plaintiffs counter by saying that any affirmative defense which would reduce the amount of the insurer's liability under the policy must be specially pleaded and, therefore, the burden rests upon the defendant. While it may be true that the co-insurance clause is denominated a "condition", nevertheless it constitutes an affirmative defense in asserting that it should be applied to any given state of facts. Assuming arguendo that the cost of the windstorm repairs to the building had been $10,000.00, the plaintiffs could then prove the issuance of the policy, the payment of the premium, the cost of the repairs occasioned by the storm damage, the loss occurring within the policy period, the refusal to pay on the part of the defendant, and rest their case. Certainly it would not be incumbent upon the plaintiffs to introduce evidence establishing the "actual cash value" of the building immediately prior to the loss as the policy provides that the insurer will pay the "actual cash value" just prior to the storm, but not exceeding the amount that it would cost to repair or replace the warehouse with materials of substantially like kind and quality. By the introduction of the repair costs, together with the other items as aforesaid, plaintiffs have established a *prima facie* case for a recovery within the stated policy limits. The burden then rests upon the insurer to prove, by a fair preponderance of the evidence, that plaintiffs are co-insurers to the extent claimed. Home Ins. Co., New York v. Eisenson, 5 Cir., 181 F.2d 416; Lever Bros. Co. v. Atlas Assur. Co., 7 Cir., 131 F.2d 770. The policy in the instant case characterizes the co-insurance clause as a "condition" but it is none the less an affirmative defense with the burden resting upon the insurer to prove the extent to which the insured is a co-insurer.

█ For this Court to now accept the figures given by the witnesses on the basis of "reproduction or replacement costs, less depreciation" in order to arrive at the "actual cash value" would not be facing up to reality. True, the Court could arbitrarily select a compromise figure of value, but this would be doing exactly what the Court warned the jury to avoid. In the state of the evidence presented, the Court accepts the higher estimate of the witness, J. L. Smith, and determines the "actual cash value" immediately prior to the storm to be $35,000.00. Thus the plaintiffs were not co-insurers as to any portion of the loss.

█ Defendant requested the Court to charge the jury that depreciation should be allowed on new materials to be installed by way of repairs to the warehouse. This request was refused, but the Court did tell the jury that used materials of a satisfactory nature could be employed, if obtainable, in making the repairs, and that the measure of indemnity was the difference between the "ac-

tual cash value" of the warehouse just prior to the storm and its value after the storm, provided, however, that plaintiffs were not entitled to collect more than the actual cash value immediately prior to the storm and, in any event, not exceeding the amount that it would cost to repair or replace the warehouse with materials of substantially like kind and quality. Counsel for defendant candidly admits that, in situations of partially destroyed property, depreciation should not be allowed on new materials used for the purpose of repair. 29 Columbia Law Review, p. 857; 115 A.L.R. 1169; McIntosh v. Hartford, etc., 106 Mont. 434, 78 P.2d 82, 115 A.L.R. 1164; Third Nat. Bank v. American Equitable Ins. Co., 27 Tenn.App. 249, 178 S.W.2d 915; Gulf Ins. Co. v. Carroll, Tex.Civ.App., 330 S.W.2d 227. The reason for the rule is obvious. If depreciation is to be deducted from the cost of new materials, it would frequently make the sum insufficient to complete the repairs, thereby resulting in the building being only partially completed.

■ Defendant now directs attention to § 38.1–374 of the Code of Virginia, 1950, as amended, which provides for specific approval of forms or provisions for certain risks. Since subsection (1) states that a policy may be written to include the use of new materials of like kind and quality, without deduction for depreciation, defendant argues that Virginia, by inference, allows depreciation on the cost of new materials in losses under policies which have not been specifically approved. Defendant has included in its brief a copy of endorsement Form 238—Virginia, which is captioned "Replacement Cost Endorsement". The only effect of this endorsement is the substitution of the term "replacement cost" for the term "actual cash value" wherever it appears in the policy. Thus, if the building is badly in need of repairs prior to the storm or fire, the insurer agrees, to the limit of the coverage, to pay the replacement cost if totally destroyed, or the repair cost if

partially destroyed. The Court does not interpret § 38.1–374 as defendant contends. It in no way affects the correctness of the charge given to the jury.

Adopting this memorandum in lieu of specific findings of fact and conclusion of law, the Clerk will be directed to enter judgment on the verdict of the jury.